**UNITED STATES of America, ex rel. Kevin G. KELLY, Plaintiff–Appellant,**

v.

**The BOEING COMPANY, Defendant–Appellee.**

**No. 92–36660.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 7, 1993.

Decided Sept. 7, 1993.

Amended Nov. 5, 1993.

---

M. Margaret McKeown, Perkins Coie, Seattle, WA, for defendant-appellant.

Linda R. MacLean, Law Offices of Herbert Hafif, Claremont, CA, for plaintiff-appellee.

Michael Davidson, Senate Legal Counsel and Claire M. Sylvia, Asst. Senate Legal Counsel, Washington, DC, for amicus.

Before: HALL, WIGGINS and LEAVY, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

This appeal presents several constitutional challenges to the qui tam provisions of the False Claims Act, 31 U.S.C. §§ 3729 et seq. The question of the constitutionality of the qui tam provisions is one of first impression in this circuit. We hold that these provisions do not exceed the limitations of Article III of the Constitution, nor do they violate the constitutional principle of separation of powers, the Appointments Clause of Article II, or the Due Process Clause of the Fifth Amendment.

## I. OVERVIEW AND BACKGROUND

The Boeing Company ("Boeing") appeals the district court's denial of its motion to dismiss a qui tam action under the False Claims Act ("FCA" or "the Act"). Qui tam plaintiff Kevin G. Kelly filed the action against Boeing on behalf of the United States to recover damages and penalties for allegedly fraudulent charges to the United States. Boeing claimed in its motion to dismiss that the district court lacked jurisdiction over Kelly's suit because the provisions of the FCA which authorize qui tam actions are unconstitutional.

The district court rejected Boeing's four constitutional challenges to the FCA, but certified an interlocutory appeal of its rulings on the constitutional issues. We granted permission to appeal pursuant to 28 U.S.C. § 1292(b). We have considered and likewise rejected Boeing's arguments. Therefore, we affirm.

### A. Facts and Proceedings Below.

In November 1989, Kelly, a former Boeing employee, filed a complaint under seal alleging that Boeing committed various violations of the False Claims Act related to its work as a subcontractor on the government's B–2 Bomber and Advanced Tactical Fighter pro-

grams. Kelly claimed that Boeing improperly charged to the government certain facilities lease costs. Kelly served his complaint on the government, as required under the Act, after which the government investigated his allegations for over three years. Upon completing its investigation, the government elected not to intervene in the case. The district court then unsealed the case, and Kelly served on Boeing an amended complaint. Boeing then moved to dismiss, raising the four constitutional challenges that it pursues in this appeal. The district court denied Boeing's motion,[1] and certified the constitutional issues for immediate appeal to this court.

### B. The Qui Tam Provisions of the FCA.

The FCA, which Congress originally enacted in 1863, is the government's "primary litigative tool for combatting fraud" against the federal government. Senate Judiciary Committee, False Claims Amendments Act of 1986, S.Rep. No. 345, 99th Cong., 2d Sess. 2 (1986), reprinted in 1986 U.S.C.C.A.N. 5266. The Act authorizes both the Attorney General and private persons to bring civil actions to enforce the Act. 31 U.S.C. § 3730 (1988). Congress amended the FCA in 1986 to increase the financial and other incentives for private individuals to bring suits under the Act and thereby to enlist the aid of the citizenry in combatting the rising problem of "sophisticated and widespread fraud."[2] S.Rep. No. 345 at 2, 23–24, reprinted in 1986 U.S.C.C.A.N. at 5267, 5288–89.

Section 3730(b) of the FCA as now constituted provides that a person may bring a civil action for a violation of the substantive provisions of the Act "for the person and for the United States Government. The action shall be brought in the name of the Government." 31 U.S.C. § 3730(b)(1). An action

---

1. The district court granted Boeing's motion to dismiss a state law wrongful discharge claim included in Kelly's amended complaint. Kelly does not contest that ruling.

2. The legislative history indicates that Congress sought to encourage more private enforcement of the FCA because "[d]etecting fraud is usually

very difficult without the cooperation of individuals who are either close observers or otherwise involved in the fraudulent activity. Yet in the area of Government fraud, there appears to be a great unwillingness to expose illegalities." S.Rep. No. 345 at 4, reprinted in 1986 U.S.C.C.A.N. at 5269.

under this provision is termed a "qui tam"[3] suit, and the person who brings such an action is referred to as a "relator" or "informer". If the government files an action to enforce the FCA, a would-be relator may not later bring any action based on the same underlying facts. 31 U.S.C. § 3730(e)(3). Nor may a private party litigate a qui tam suit based on the public findings of a government investigation or on disclosures in the news media, unless that party is an original and independent source of the information on which the complaint is based. *Id.* § 3730(e)(4)(A)–(B).

Upon bringing a qui tam action, a relator must serve on the government a copy of the complaint and written disclosure of substantially all material evidence and information the relator possesses. The complaint must be filed in camera and remain under seal for at least 60 days so that the government may investigate the relator's allegations, though upon a showing of "good cause" the government may move the court for extensions of the 60 day period. *Id.* § 3730(b)(2), (3). By the end of the period provided for the government's investigation, the government must decide whether to intervene and proceed with the action, "in which case the action shall be conducted by the Government," *id.* § 3730(b)(4)(A), or whether to decline to take over the action, "in which case the person bringing the action shall have the right to conduct the action." *Id.* § 3730(b)(4)(B).

The Act explicitly provides that if the government takes over the qui tam action from the start, "it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action." *Id.* § 3730(c)(1). Though the relator "shall have the right to continue as a party," *id.*, the government may end the litigation or limit the participation of the relator in several ways. First, the government may dismiss the action "notwithstanding the objections of the person initiating the action" once the relator has received notice and an opportunity for a hearing on the dismissal motion. *Id.* § 3730(c)(2)(A). Second, the government may settle with the defendant "notwithstanding the objections of the person initiating the action," but only if the court determines after a hearing "that the proposed settlement is fair, adequate, and reasonable under all the circumstances." *Id.* § 3730(c)(2)(B). Third, the government may request that the court impose appropriate limitations on the relator's participation if it shows that unrestricted participation "would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment." *Id.* § 3730(c)(2)(C). The Act also provides the defendant an opportunity to request that the court limit the relator's participation, upon a showing that unrestricted participation "would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense." *Id.* § 3730(c)(2)(D).

When the government chooses not to take over a qui tam action, the relator "shall have the right to conduct the action." *Id.* § 3730(c)(3). Upon the government's request, however, the relator must serve the government with copies of all pleadings and deposition transcripts. Whether or not the government takes over the action from the outset, it may ask the court to stay the relator's discovery for an extendable 60–day period, upon a showing that the relator's discovery "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts." *Id.* § 3730(c)(4).

In cases where the government initially elects not to take over the action, the court "may nevertheless permit the Government to intervene at a later date upon a showing of good cause." *Id.* § 3730(c)(3). In permitting late intervention, the court may not limit "the status and rights" of the relator. *Id.* The parties and amici in this appeal raise two questions concerning this particular aspect of the qui tam provisions. First, they dispute the height of the "good cause" hurdle. Sec-

---

**3.** The term "qui tam" is short for "qui tam pro domino rege quam pro se imposo sequitur," which is interpreted as "who brings the action as well for the king as for himself." *Bass Anglers*

*Sportsman's Soc'y of America v. U.S. Plywood–Champion Papers, Inc.,* 324 F.Supp. 302, 305 (S.D.Tex.1971).

ond, they dispute the meaning of the proviso that the court may not limit the relator's "status and rights." Boeing claims that this proviso means the relator retains primary authority to conduct the action, whereas Kelly claims that this simply means the relator retains the right to participate as a party to the litigation.[4] Both questions relate to the broader issue, addressed in the discussion section of this opinion, concerning the extent of the government's ability to exert control over a qui tam suit.

The Act provides for a range of possible awards to successful qui tam plaintiffs. In actions which the government has taken over, the relator receives between 15 and 25 percent of the proceeds of the action or settlement of the claim. But if the court finds that the action is based primarily on information of which the relator is not the original source, the relator's award must be limited to no more than 10 percent of the proceeds or settlement. In actions in which the government has not intervened, the relator receives between 25 and 30 percent of the proceeds or settlement. In any of the above situations, the relator also receives an amount for reasonable expenses, attorneys' fees and costs, awarded against the defendant rather than taken out of the proceeds or settlement. *Id.* § 3730(d)(1), (2). On the other hand, an unsuccessful relator in a case in which the government has not intervened may be ordered to pay the defendant its reasonable attorneys' fees and expenses if the court finds that the relator's claim "was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." *Id.* § 3730(d)(4).

## II. STANDARD OF REVIEW

We review de novo the purely legal question whether a statute is constitutional. *Gray v. First Winthrop Corp.,* 989 F.2d 1564, 1567 (9th Cir.1993). We are mindful that we should invalidate an act of Congress only "for the most compelling constitutional reasons." *Mistretta v. United States,* 488 U.S. 361, 384, 109 S.Ct. 647, 661, 102 L.Ed.2d 714 (1989)

(quoting *Bowsher v. Synar,* 478 U.S. 714, 736, 106 S.Ct. 3181, 3192, 92 L.Ed.2d 583 (1986) (Stevens, J., concurring in judgment)). Furthermore, we recognize that we are obliged whenever "fairly possible" to interpret a statute in a manner that renders it constitutionally valid. *Communications Workers of America v. Beck,* 487 U.S. 735, 762, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988). Our adherence to this principle of presumptive constitutionality is guided by our understanding that "[w]hen we are required to pass on the constitutionality of an Act of Congress, we assume 'the gravest and most delicate duty that this Court is called on to perform.'" *Fullilove v. Klutznick,* 448 U.S. 448, 472, 100 S.Ct. 2758, 2771, 65 L.Ed.2d 902 (1980) (citation omitted).

## III. DISCUSSION

### A. *Standing.*

1. Article III Requirements.

We first address the threshold question of justiciability—whether a qui tam plaintiff has standing to sue under the FCA. Article III, section 2 of the Constitution limits the judicial power of the United States to the resolution of cases and controversies. The doctrine of standing is used to determine whether a conflict qualifies as a case or controversy and is therefore capable of judicial resolution. *Lujan v. Defenders of Wildlife,* ___ U.S. ___, ___, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Standing, in turn, is dependent on three conditions. First, the plaintiff must have suffered an "injury in fact." This consists of an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent. Second, there must be a causal connection between the injury and the conduct serving as the basis of the lawsuit. In other words, the injury has to be traceable to the challenged action of the defendant and not the result of the conduct of a third party not before the court. Third, it must be likely that the injury will be redressed by a favorable decision. *Id.*

---

4. Kelly argues that § 3730(c)(3) "simply secures the party status and percentage award to which the relator would have been entitled had he

continued to litigate the case without government intervention."

Boeing and amici curiae argue that the only injuries implicated in qui tam suits are injuries to the federal treasury resulting from false claims against the United States. Qui tam relators do not suffer harm, and are therefore unable to establish the constitutional elements of standing. It follows that by granting standing to private parties, the FCA's qui tam provisions run afoul of Article III and are unconstitutional.

We disagree and hold that the FCA effectively assigns the government's claims to qui tam plaintiffs such as Kelly, who then may sue based upon an injury to the federal treasury. Under this theory of standing, the FCA's qui tam provisions operate as an enforceable unilateral contract. The terms and conditions of the contract are accepted by the relator upon filing suit. If the government declines to prosecute the alleged wrongdoer, the qui tam plaintiff effectively stands in the shoes of the government. Because the government clearly is capable of establishing injury-in-fact, causation, and redressability, qui tam plaintiffs satisfy these Article III requirements as well.

Several courts and commentators have embraced this assignment theory. *See United States ex rel. Kreindler & Kreindler v. United Technologies Corporation*, 985 F.2d 1148 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993); *United States Dept. of Housing and Urban Develop. ex rel. Givler v. Smith*, 775 F.Supp. 172, 180–81 (E.D.Pa.1991); *Truong v. Northrop Corporation*, 728 F.Supp. 615, 618–620 (C.D.Cal. 1989); Thomas R. Lee, Comment, *The Standing of Qui Tam Relators Under the False Claims Act*, 57 U.Chi.L.Rev. 543, 563–70 (1990). Moreover, this theory comports with federal practice. Federal courts routinely find that fraud claims are assignable. *See AmeriFirst Bank v. Bomar*, 757 F.Supp. 1365, 1370–71 (S.D.Fla.1991) (10b–5 claims assignable); *Federal Deposit Ins. Corp. v. Main Hurdman*, 655 F.Supp. 259, 266–68 (E.D.Cal.1987) (bank's actions for fraud and malpractice assignable to FDIC); *In re National Mortg. Equity Corp.*, 636 F.Supp. 1138, 1152–56 (C.D.Cal.1986) (RICO treble damage claims assignable). In addition, federal courts consistently recognize that an assignee of a fraud claim can assert his claim despite being unable to satisfy traditional standing requirements. *AmeriFirst Bank*, 757 F.Supp. at 1370; *Main Hurdman*, 655 F.Supp. at 267. *See also National Ass'n of Realtors v. Nat. Real Est. Ass'n*, 894 F.2d 937, 941 (7th Cir.1990).

Boeing and amici curiae argue that it strains reason to suggest that Congress was attempting to make a legal assignment through the FCA. They emphasize that the word "assignment" does not appear in the statute, and that no other language suggests that Congress was attempting to bestow a contractual right on the plaintiffs.

We disagree. It is well established that terms of art are not required for a valid assignment. "[T]he assignor need not even use the word 'assign'." Allan E. Farnsworth, *Contracts* § 11.3, at 786 (2d ed. 1990). Instead, the parties' intent controls. *Klamath–Lake Pharm. v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1283 (9th Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983). We conclude that Congress intended to assign the government's fraud claims to individual qui tam plaintiffs in cases where the government itself chooses not to pursue such claims. The express language of the FCA gives relators the right to bring suit on behalf of the government. Moreover, the entire purpose of the FCA's qui tam provisions is to employ the help of individuals to uncover fraud against the government.

We are unconcerned that the assignment of the government's claim is contingent on a qui tam plaintiff filing suit, that the qui tam plaintiff is only assigned part of the government's claim, and that the government retains the right to intervene. Assignments can be made conditional on the occurrence of a future event. Farnsworth, § 11.3, at 789. In addition, the fact that the relator is only entitled to a maximum of thirty percent of the total recovery of a qui tam suit is insignificant. This court has observed that "[a]n assignment of claims does not prevent the assignors from receiving the benefits of the litigation." *Klamath–Lake Pharm.*, 701 F.2d at 1282. Finally, the government's retention of the right to intervene in a relator's action upon a showing of good cause is completely

consistent with the rule that an assignment may be limited in its effect. Farnsworth, § 11.3, at 789.

### 2. Policy Concerns.

Thus, we hold that the FCA's qui tam provisions do not run afoul of Article III. Consideration of the policy concerns underlying the standing doctrine supports this conclusion. In *Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984), the Supreme Court explained that "the law of Art. III standing is built on a single basic idea—the idea of separation of powers." Standing ensures that federal courts maintain their properly limited role in a democratic society by requiring that cases are presented in an adversarial context and in a form historically viewed as capable of judicial resolution. *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968).

Qui tam suits are presented in the traditional adversarial context. They involve concrete factual disputes which prevent the federal courts from being converted into "judicial versions of college debating forums" issuing abstract opinions. *Valley Forge Christian College v. Americans United for the Separation of Church and State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). In addition, qui tam plaintiffs have the requisite personal stake in the outcome of the case to ensure that the issues are presented sharply and that more than "the vindication of the value interests of concerned bystanders" is at issue. *Id.* This personal stake derives from the following three factors: (1) the qui tam plaintiff must fund the prosecution of the FCA suit; (2) the qui tam plaintiff receives a sizable bounty if he prevails in the action; and (3) the qui tam plaintiff may be liable for costs if the suit is frivolous. *Kreindler & Kreindler*, 985 F.2d at 1154.

Qui tam suits also are capable of judicial resolution. They involve allegations of fraud—an area of law that is neither novel nor extraordinarily complex. By resolving these suits, federal courts are not intruding into areas committed to the other branches of government. Instead, they are merely accommodating a congressional policy decision that relators may sue on behalf of the government for violations of the FCA. As we explain more fully in the next section of this opinion, in no way does this upset the tripartite allocation of power upon which our government is based. *Givler*, 775 F.Supp. 172, 180–81.

### B. Separation of Powers.

■ We next consider whether the qui tam provisions of the FCA violate the principle of separation of powers. The FCA's grant of authority to private parties to sue in the name of the United States for injuries to the federal treasury is certainly anomalous with respect to normal divisions of authority. But the question in this case is not whether the qui tam provisions fit neatly into usual public power distribution patterns; rather, the question is whether the Constitution *prohibits* use of this mechanism of civil law enforcement. To answer that question, we must determine whether Congress, under its policymaking authority, may place the prosecution of claims based on injuries to the government under the direction of qui tam relators.[5] In other words, we must decide whether the separation of powers principle inherent in the structure of the Constitution proscribes assignment of this essentially prosecutorial function to private parties.

### 1. General Principles.

The principle that the various powers of government must be separated and assigned to coordinate branches is fundamental to our form of government. The Framers, aware that concentration of power breeds tyranny,

---

**5.** In *United States, ex rel. Marcus v. Hess*, 317 U.S. 537, 542, 63 S.Ct. 379, 383, 87 L.Ed. 443 (1943), the Supreme Court held, referring to the FCA qui tam provisions, that "Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it...." We do not believe this to be conclusive authority on the questions we address in this opinion for several reasons: the Court did not squarely face the constitutional issues presented in our case; the Court's jurisprudence regarding these issues has developed significantly since 1943; and Congress has substantially amended the FCA twice since the *Hess* decision.

embedded the separation of powers principle into the Constitution in order to preserve liberty. The Supreme Court has repeatedly pronounced upon the importance of this principle in our constitutional scheme. *See e.g., Mistretta,* 488 U.S. at 380, 109 S.Ct. at 659 ("This Court consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty."); *Morrison v. Olson,* 487 U.S. 654, 693, 108 S.Ct. 2597, 2620, 101 L.Ed.2d 569 (1988) ("Time and again we have reaffirmed the importance in our constitutional scheme of the separation of governmental powers into the three coordinate branches."); *Freytag v. Commissioner of Internal Revenue,* —— U.S. ——, ——, 111 S.Ct. 2631, 2634, 115 L.Ed.2d 764 (1991); *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2298, 2310, 115 L.Ed.2d 236 (1991).

The Supreme Court has also consistently recognized that "the Constitution by no means contemplates total separation" of the three branches of government. *Buckley v. Valeo,* 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976). Because the Court has acknowledged that a workable government requires a degree of interdependence and overlapping responsibility, the Court has "never held that the Constitution requires that the three branches of Government 'operate with absolute independence.'" *Morrison,* 487 U.S. at 694, 108 S.Ct. at 2620 (quoting *United States v. Nixon,* 418 U.S. 683, 707, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974)). Nevertheless, the Court has "not hesitated to invalidate provisions of law which violate" the separation of powers principle. *Id.* 487 U.S. at 693, 108 S.Ct. at 2620; *Buckley,* 424 U.S. at 123, 96 S.Ct. at 684. We understand that, likewise, we must not hesitate to do so.

This case does not involve the type of separation of powers problem posed by one branch of government arrogating power at the expense of another. *See Mistretta,* 488 U.S. at 382, 109 S.Ct. at 660 ("It is this concern of encroachment and aggrandizement that has animated our separation-of-powers jurisprudence and aroused our vigilance against the 'hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power.'") (citation omitted); *Morrison,* 487 U.S. at 693, 108 S.Ct. at 2620; *Freytag,* —— U.S. at ——, 111 S.Ct. at 2638. Instead, this case requires us to determine the extent to which the legislative branch may, while remaining within constitutional boundaries, diminish the executive branch's authority without taking any of that authority as its own.

The Supreme Court has recognized that the separation of powers doctrine can be violated by "provisions of law that *either* accrete to a single Branch powers more appropriately diffused among separate Branches *or* that undermine the authority and independence of one or another coordinate Branch." *Mistretta,* 488 U.S. at 382, 109 S.Ct. at 660 (emphasis added). It is the second type of violation that is at issue in this case. Although the Supreme Court has had occasion to address whether an act of Congress has triggered this type of violation, *see Commodity Futures Trading Commission v. Schor,* 478 U.S. 833, 856–57, 106 S.Ct. 3245, 3259–60, 92 L.Ed.2d 675 (1986) (case raised no question of congressional aggrandizement but instead question whether Congress impermissibly undermined role of judicial branch); *Morrison,* 487 U.S. at 694, 108 S.Ct. at 2621 ("We observe first that this case does not involve an attempt by Congress to increase its own powers at the expense of the Executive Branch."), it has never considered a situation where Congress has sought to disperse some quantum of executive authority amongst the general public.

2. Applicable Tests.

The Supreme Court has established that where an act of Congress arguably threatens the integrity of another branch's authority and independence, the proper separation of powers inquiry is whether Congress has "impermissibly undermined" the role of that branch. *Schor,* 478 U.S. at 856, 106 S.Ct. at 3260. This is the test which we apply to the qui tam provisions of the FCA. In other

words, we must consider whether the qui tam provisions " 'disrupt[ ] the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions.' " *Morrison,* 487 U.S. at 695, 108 S.Ct. at 2621 (quoting *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977)). To determine whether the qui tam provisions undermine the role of the Executive Branch, we must decide whether, within the meaning expressed in *Morrison,* these provisions accord the Executive Branch "sufficient control" over the conduct of relators to "ensure that the President is able to perform his constitutionally assigned duties." [6] *Morrison,* 487 U.S. at 696, 108 S.Ct. at 2622.

### 3. Comparison to *Morrison v. Olson.*

The authority most analogous to this case is *Morrison v. Olson,* in which the Supreme Court held that the independent counsel provisions of the Ethics in Government Act do not impermissibly interfere with the functions of the Executive Branch in violation of the separation of powers principle. 487 U.S. at 697, 108 S.Ct. at 2622. *Morrison* provides a baseline against which we may assess whether Congress has unconstitutionally diminished executive power by permitting private plaintiffs to sue in the name of the United States for an injury to the federal treasury. Comparison to *Morrison* is particularly useful because that case considers the degree to which Congress may assign prosecutorial powers to persons not under the direct control of the Executive Branch.

Before comparing the qui tam provisions of the FCA to the independent counsel provisions of the Ethics in Government Act, we must address Boeing's contention that *only*

the Executive Branch has the power to enforce laws, and therefore to prosecute violations of law.[7] It is clear to us that no such absolute rule exists. *Morrison* itself indicates otherwise because that decision validated the independent counsel provisions of the Ethics in Government Act even though it recognized that "[i]t is undeniable that the Act reduces the amount of control or supervision that the Attorney General and, through him, the President exercises over the investigation and prosecution of a certain class of alleged criminal activity." 487 U.S. at 695, 108 S.Ct. at 2621. The Court also stated in *Morrison* that "[t]here is no real dispute that the functions performed by the independent counsel are 'executive' in the sense that they are law enforcement functions that *typically* have been undertaken by officials within the Executive Branch." 487 U.S. at 691, 108 S.Ct. at 2619 (emphasis added). Use of the word "typically" in that sentence, considered in light of the Court's ultimate conclusion upholding the independent counsel provisions, must mean that prosecutorial functions need not *always* be undertaken by Executive Branch officials. *See* Stephanie A.J. Dangel, Note, *Is Prosecution a Core Executive Function? Morrison v. Olson and the Framers' Intent,* 99 Yale L.J. 1069, 1070 (1990) (Framers intended that prosecution would be undertaken by but not constitutionally assigned to executive officials, and that such officials would typically but not always prosecute). Thus, we reject Boeing's assertion that *all* prosecutorial power of any kind belongs to the Executive Branch.

Both sides in this litigation compare the degree of executive control over independent counsels to the degree of executive control over qui tam relators, yet they reach opposite conclusions. Boeing contends that *Mor-*

---

6. For purposes of this case, the relevant presidential duty is to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

7. To support this proposition, Boeing cites dicta from several cases, including *Buckley,* 424 U.S. at 138, 96 S.Ct. at 691 ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.' "), and *Springer v. Philippine Islands,* 277 U.S. 189, 202,

48 S.Ct. 480, 482, 72 L.Ed. 845 (1928) ("Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions.") We note that the Court in those cases was concerned with congressional encroachment on executive powers, and did not have before it any question (such as that presented here) concerning the role of private parties in an enforcement scheme.

*rison* stands at the outer limits of congressional authority to insulate government litigation from presidential control. Even accepting that proposition as true, however, we conclude that the FCA qui tam provisions do not exceed those limits. That is, the FCA permits a degree of executive control sufficient to satisfy the *Morrison* standard.

Each side in this case proposes a different approach to comparing the qui tam provisions to the independent counsel provisions. Boeing suggests that we should look at the precise means of executive control identified and found sufficient in *Morrison,* and then base our decision on the absence of those same means in the qui tam provisions. Kelly, on the other hand, suggests that we identify all possible means of executive control in the qui tam provisions, and then compare them *in toto* to the means of control identified in *Morrison.* We believe that, under *Morrison,* Kelly's approach is the correct one. Twice in *Morrison* the Court stated that the proper inquiry is whether the Act "taken as a whole" violates the principle of separation of powers by unduly interfering with the President's constitutional role. 487 U.S. at 685, 693, 108 S.Ct. at 2615, 2620. Thus, Morrison instructs us to compare the qui tam provisions "as a whole" to the independent counsel provisions "as a whole".

The powers of an independent counsel are quite broad. "With respect to all matters within the independent counsel's jurisdiction, the Act grants the counsel 'full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General, and any other officer or employee of the Department of Justice.' " *Morrison,* 487 U.S. at 662, 108 S.Ct. at 2604, citing 28 U.S.C. § 594(a). The counsel's functions and powers include conducting grand jury proceedings and other investiga-

tions, initiating and conducting civil and criminal litigation, accepting referrals of matters from the Attorney General, framing and signing indictments, filing informations, appealing decisions, and handling all aspects of any case "in the name of the United States." 487 U.S. at 662, 108 S.Ct. at 2604. The counsel may also draw on public resources by appointing employees, and requesting and obtaining assistance from the Department of Justice. *Id.* In addition, "whenever a matter has been referred to an independent counsel under the Act, the Attorney General and the Justice Department are required to suspend all investigations and proceedings regarding the matter." *Id.* at 662–63, 108 S.Ct. at 2604, citing 28 U.S.C. § 597(a).

The powers of a qui tam relator vary depending on whether and when the government takes over the qui tam action. First, when a relator proceeds with a case in which the government has not intervened, the relator exercises the broadest possible authority the FCA permits. Such a relator has full power to conduct litigation of the particular case in the name of the United States, but only with the resources of a private plaintiff and subject to possible discovery limitations. Also, a relator who pursues a frivolous action can be ordered to pay the defendant's costs and attorneys' fees. On the other hand, when the government takes over a qui tam case from the outset, the FCA explicitly accords the government primary authority to conduct the case. Finally, when the government intervenes late in the action, a fair interpretation of the statute is that the government has a similar degree of control over the litigation as if it had intervened at the start.[8] In comparison to any of these three situations, an independent counsel exercises broader investigative authority, prosecutorial discretion, and authority to use the resources

---

8. As mentioned in Part I.B. of this opinion, the parties dispute whether the government exercises the same degree of authority whether it intervenes at the outset or later. The statute is ambiguous on this point, but can, if necessary to preserve the constitutionality of the statute, be read to provide the government the same authority to dismiss or settle the suit regardless of when it intervenes. *See Morrison,* 487 U.S. at 682, 108 S.Ct. at 2614 (regarding interpretation of a provi-

sion not tested in practice, Court noted that "it is the duty of federal courts to construe a statute in order to save it from constitutional infirmities . . . and to that end we think a narrow construction is appropriate here."); *Schor,* 478 U.S. at 841, 106 S.Ct. at 3251 (courts must construe federal statutes so as "to avoid serious doubt of their constitutionality") (internal quotation omitted).

of the U.S. government than does a qui tam relator.

*Morrison* identifies several means by which the Executive Branch can control an independent counsel's exercise of the powers outlined above. First, no independent counsel may be appointed without a specific request by the Attorney General, and the Attorney General's decision not to request an appointment is unreviewable. Second, the Attorney General retains the power to remove an independent counsel, though only upon a showing of "good cause." The Act requires the Attorney General to submit a report to the Judiciary Committees of the House and the Senate and to a special court responsible for appointing independent counsels specifying the grounds for removal. *Morrison,* 487 U.S. at 663, 108 S.Ct. at 2604 (citing 28 U.S.C. § 596(a)(2)). The Attorney General's removal authority is further limited by the Act's provision that an independent counsel can obtain judicial review of the Attorney General's removal action by filing a civil suit. The Act authorizes the reviewing court to grant reinstatement or "other appropriate relief." *Id.* at 663–64, 108 S.Ct. at 2605 (citing 28 U.S.C. § 596(a)(3)).

Third, the independent counsel's "jurisdiction" is defined with reference to the facts submitted by the Attorney General upon requesting an appointment. However, it is the special court charged with appointing an independent counsel that actually defines the counsel's prosecutorial jurisdiction. *Id.* at 661, 108 S.Ct. at 2603 (citing 28 U.S.C. §§ 593(b), 487 U.S. at 679, 108 S.Ct. at

2613).[9] Finally, the Act requires the counsel to abide by Department of Justice policies, unless it is not possible to do so. *Morrison,* 487 U.S. at 696, 108 S.Ct. at 2621. The Court concluded that these features give the Executive Branch "*sufficient control* over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties." *Id.* (emphasis added). We note that the Court reached this conclusion despite the fact that the Attorney General's unreviewable discretion to request appointment of an independent counsel is the only unconditional means of executive control which the Ethics in Government Act provides.

Under the FCA, the Executive Branch can control a qui tam relator's exercise of prosecutorial powers in several ways. The government can intervene in a case and then take primary responsibility for prosecuting the action; it can seek judicial limitation of the relator's participation; it can move for dismissal of a case which it believes has no merit,[10] after notice to the relator and opportunity for a hearing; it can seek a judicial stay of the relator's discovery regardless of whether it intervenes; and it remains free to seek any alternate remedies available, including through any administrative proceeding. 31 U.S.C. § 3730(c).

Several of the control mechanisms built into the qui tam provisions are qualified. For example, the government may dismiss an action in which it has intervened only after an objecting relator has had an opportunity for a hearing,[11] and may settle with a

---

**9.** The Court held in *Morrison* that Article III does not prohibit Congress from vesting the Judicial Branch with power to define an independent counsel's jurisdiction as an incident to its power to appoint an independent counsel. *Id.* at 678–79, 108 S.Ct. at 2612–13.

**10.** At least one district court has interpreted the FCA to permit the government to move for dismissal of a qui tam action without actually intervening in the case. *Juliano v. Federal Asset Disposition Ass'n,* 736 F.Supp. 348 (D.D.C.1990), *aff'd,* 959 F.2d 1101 (D.C.Cir.1992). After four months of investigating Juliano's claims, the government filed a notice that it declined to take over the action as to some defendants, and that it moved to dismiss the others. *Id.* at 349. The court stated that in order to avoid serious constitutional questions which unduly curtailing the

Attorney General's prosecutorial discretion would raise, it would interpret the Act's provision that the "Government may dismiss the action notwithstanding the objections" of the relator to apply to actions in which the government has not already intervened. *Id.* at 351. As the court aptly pointed out, the Act nowhere prohibits such an interpretation. *See id.* Though the specific question addressed in *Juliano* is not directly before us, we believe that the court's interpretation of the FCA is entirely appropriate and provides an illustration of the meaningful control which the Executive Branch can exercise over qui tam actions.

**11.** It is not clear whether in practice this notice and hearing requirement has amounted to much of a hurdle for the government. However, we

defendant only after a court has determined that the proposed settlement is "fair, adequate, and reasonable under all the circumstances." [12] 31 U.S.C. § 3730(c)(2)(A), (B). Furthermore, the government must show "good cause" in order to intervene in an action which has already commenced. *Id.* § 3730(c)(3). However, the only unqualified control built into the independent counsel provisions is that the Attorney General has unreviewable discretion to request appointment of a counsel, and therefore to initiate litigation by a counsel. Boeing argues that the power to initiate litigation is an important and exclusively executive function. [13] Clearly, the government has greater authority to prevent the initiation of prosecution by an independent counsel than by a qui tam relator. But once prosecution has been initiated, the government has greater authority to limit the conduct of the prosecutor and ultimately *end* the litigation in a qui tam action than it does in an independent counsel's action. [14] We conclude that because the Executive Branch has power, albeit somewhat qualified, to end qui tam litigation, it is not significant that it can not prevent its start.

The Court in *Morrison* noted that even though the mechanisms just discussed give the Executive Branch sufficient control over an independent counsel, it "is undeniable that the Act reduces the amount of control or supervision that the Attorney General and, through him, the President exercises over the investigation and prosecution of a certain class of alleged criminal activity." *Morrison,* 487 U.S. at 695, 108 S.Ct. at 2621. The Court specifically pointed out that the Act does not allow the Attorney General to appoint the individual of his or her choice, to determine the counsel's jurisdiction, or to remove a counsel at will. *Id.* at 695–96, 108 S.Ct. at 2621. Likewise, we do not deny that the qui tam provisions of the FCA to some

note that Congress apparently intended that the provision authorizing relators to formally object to any motions to dismiss or proposed settlements between the government and defendant should not pose a significant burden for the government or courts. The Senate Judiciary Committee Report on the version ultimately passed of the 1986 amendments to the FCA stated:

> Any objections filed by the *qui tam* plaintiff may be accompanied by a petition for an evidentiary hearing on those objections. The Committee does not intend, however, that evidentiary hearings be granted as a matter of right. We recognize that an automatic right could provoke unnecessary litigation delays. Rather, evidentiary hearings should be granted when the *qui tam* relator shows a "substantial and particularized need" for a hearing. Such a showing could be made if the relator presents a colorable claim that the settlement or dismissal is unreasonable in light of existing evidence, that the Government has not fully investigated the allegations, or that the Government's decision was based on arbitrary and improper considerations.

Senate Judiciary Committee, False Claims Amendments Act of 1986, S.Rep. No. 345, 99th Cong., 2d Sess. 26 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291.

12. Significant precedent exists for the requirement that a court approve the government's decision to terminate a case brought on behalf of the United States. For example, Federal Rule of Criminal Procedure 48(a) requires the government to obtain leave of court to terminate a prosecution by dismissing an indictment, infor-

mation or complaint. In addition, the government may settle a criminal case by plea bargain only with court approval. And finally, a court may enter a consent judgment proposed by the government in an antitrust action only if it is in the public interest. *See United States, ex rel. Truong v. Northrop Corp.,* 728 F.Supp. 615, 622 (C.D.Cal.1989); *United States, ex rel. Stillwell v. Hughes Helicopters, Inc.,* 714 F.Supp. 1084, 1093 (C.D.Cal.1989).

13. Boeing supports this proposition by citing to dicta in two cases, i.e., *Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985) ("the decision of a prosecutor in the Executive Branch not to indict ... has long been regarded as the special province of the Executive Branch."), and *United States v. Nixon,* 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974) (Court noted the argument of President's counsel that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"). We do not believe these comments amount to an absolute rule that only executive officers may initiate any type of litigation in the name of the United States.

14. The Attorney General can do no more than suggest to a court that it terminate the office of an independent counsel. *Morrison,* 487 U.S. at 664, 108 S.Ct. at 2605. By comparison, the government "may dismiss" a qui tam action "notwithstanding the objections" of the relator, as long as the relator has received notice and an opportunity for a hearing. 31 U.S.C. § 3730(c)(2)(A).

degree diminish Executive Branch control over the initiation and prosecution of a defined class of civil litigation. Nonetheless, we find that the Executive Branch exercises at least an equivalent amount of control over qui tam relators as it does over independent counsels.[15] Thus, the FCA gives the Attorney General sufficient means of controlling or supervising relators to satisfy separation of powers concerns.

In addition to considering whether the Ethics in Government Act taken as a whole violates the separation of powers principle, the Court in *Morrison* also specifically addressed whether the provision of the Act restricting the Attorney General's power to remove an independent counsel, taken by itself, impermissibly interferes with the President's exercise of his functions. 487 U.S. at 685, 108 S.Ct. at 2615. The Court held in *Morrison* that the "good cause" restriction on the Attorney General's power to remove an independent counsel does not violate separation of powers. *Id.* at 693, 108 S.Ct. at 2620. The essence of the Court's removal analysis in *Morrison*, based on its interpretation of prior removal jurisprudence, is an inquiry into whether Congress has impermissibly encroached on executive power by limiting presidential removal authority. *Id.* at 685–93, 108 S.Ct. at 2615–20. *See also Bowsher v. Synar*, 478 U.S. 714, 726, 106 S.Ct. 3181, 3187, 92 L.Ed.2d 583 (1986) ("Congress cannot reserve for itself the power of removal of an officer charged with the execution of the laws."). The Court found no such encroachment evident in the independent counsel provisions. *Morrison*, 487 U.S. at 691, 108 S.Ct. at 2619.

In light of the attention paid to the removal issue in *Morrison*, we have considered whether the lack of a provision permitting the government to "remove" a relator invalidates the qui tam provisions. Short of dismissing a qui tam action, the government can only seek *limitation* of a relator's participation in a case. 31 U.S.C. § 3730(c)(2)(C). However, the concept of removal does not make sense in the qui tam context, in which there is no "office" from which to remove the relator and subsequently fill with someone else. *Cf. Morrison*, 487 U.S. at 664, 108 S.Ct. at 2605 (discussing procedures for terminating the "office" of an independent counsel). In contrast to independent counsels, relators are not replaceable. *Cf. id.* at 662 n. 5, 108 S.Ct. at 2604 n. 5 (special court which appoints independent counsels authorized under 28 U.S.C. § 593(e) to fill vacancies due to death, resignation or removal of an independent counsel). The only practicable way to "remove" a relator is to end the qui tam litigation—and this the government has power to do. While the government's power to end qui tam litigation is qualified, so is the government's power to remove an independent counsel;[16] thus, these aspects of the two Acts are not meaningfully distinguishable for purposes of separation of powers analysis.

### 4. Judicial Encroachment.

■ We have discussed in the preceding the central separation of powers issue presented to us in this appeal—that is, whether Congress has impermissibly undermined the role of the Executive Branch by permitting private parties to exercise some measure of prosecutorial authority. We must also resolve a distinct, but in this case less difficult, separation of powers problem: whether the qui tam provisions disrupt the proper balance of power between the three branches by permitting the Judicial Branch to encroach

---

**15.** The "jurisdiction" of a relator seems necessarily limited by the terms of the False Claims Act and the facts of the particular case; thus the fact that the Attorney General plays a role in defining an independent counsel's jurisdiction but not a relator's does not set the two Acts apart.

**16.** In holding that Congress's imposition of a "good cause" standard for removal does not unduly trammel on executive authority, the Court stated:

> Although the counsel exercises no small amount of discretion and judgment in deciding how to carry out his or her duties under the Act, we simply do not see how the President's need to control the exercise of that discretion is so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President.

*Morrison*, 487 U.S. at 691–92, 108 S.Ct. at 2619.

on executive authority. We recognize the general rule that under Article III, courts may not exercise "executive or administrative duties of a nonjudicial nature." *Buckley,* 424 U.S. at 123, 96 S.Ct. at 684. The purpose of this rule is "to maintain the separation between the Judiciary and the other branches of the Federal Government by ensuring that judges do not encroach upon executive or legislative authority or undertake tasks that are more properly accomplished by those branches." *Morrison,* 487 U.S. at 680–81, 108 S.Ct. at 2613.

Boeing argues that the FCA gives federal courts too much control over whether the government may intervene later in a qui tam action which it initially declined to take over, because the Act requires the government to demonstrate "good cause" to do so. Boeing asserts that the "good cause" hurdle significantly interferes with the government's prosecutorial authority. Boeing attempts to support that assertion by noting that the court denied the government's intervention request in one out of only two cases of which it is aware in which the government has sought late intervention.[17] Boeing further argues that the FCA impermissibly grants the judiciary approval authority over government decisions to dismiss qui tam suits.

We conclude that the judicial involvement which the FCA authorizes does not contravene the separation of powers principle. First, in the absence of any meaningful indication that these requirements pose significant barriers to the Executive Branch's exercise of its prosecutorial authority, we see no reason to construe them as such and thereby heighten constitutional concerns. *See* note 8. Second, as we noted earlier, ample precedent exists for judicial oversight of the government's decision to dismiss a qui tam action. *See* note 12.

Furthermore, the extent of judicial involvement in the qui tam scheme is no greater than the extent of judicial involvement in

implementation of the independent counsel provisions of the Ethics in Government Act. The Court in *Morrison* held that the Constitution permits Congress to vest power in a special federal court to decide whom to appoint to the office of independent counsel, as well as to define a counsel's jurisdiction and perform a variety of other functions which, though "essentially ministerial," do require the exercise of some judgment and discretion. *Morrison,* 487 U.S. at 676–81, 108 S.Ct. at 2611–13. The Court also held that the special court's power to terminate the office of independent counsel is not a significant judicial encroachment on executive authority, even though it is not a typically judicial power and "has few analogues among the court's more traditional powers." *Id.* at 682, 108 S.Ct. at 2614. The Court explicitly construed the termination provision narrowly "in order to save it from constitutional infirmities," though it acknowledged that "an adventurous special court" conceivably could use its termination power aggressively. *Id.*

In light of *Morrison,* we believe it is not dispositive that no direct analogue exists for judicial authority to determine whether the government has demonstrated good cause to take over a case prosecuted in the name of United States.[18] This power may affect the government's prosecutorial discretion to some degree, but it does not amount to the power to supervise the prosecutorial conduct of either the Attorney General or a relator. *Cf. Morrison,* 487 U.S. at 681, 108 S.Ct. at 2614 ("The Act simply does not give the [special court] the power to 'supervise' the independent counsel in the exercise of his or her investigative or prosecutorial authority.") By comparison, we note that *Morrison* approved a scheme in which the Attorney General relinquishes *all* unqualified prosecutorial discretion with respect to a matter referred to an independent counsel once he or she has

---

17. Unfortunately, Boeing did not provide us with a name or citation for that one case; thus, we are unable to verify whether the court did in fact deny the government's request for intervention or to consider the court's reasoning.

18. Federal courts do, however, routinely make evaluations which are similar to the intervention determination under the FCA. *See* Federal Rule of Civil Procedure 24(b) (permissive intervention). Of course, Rule 24(b) determinations do not raise the Article III concerns we address here.

decided to request appointment of a counsel. Moreover, *Morrison* specifically held that the provision that the Attorney General must show "good cause" to remove an independent counsel and that the removal decision is subject to judicial review does not offend constitutional principles by permitting excessive judicial involvement. *Id* at 691, 108 S.Ct. at 2619.

Considering the matter with a practical eye, *cf. Schor*, 478 U.S. at 851, 106 S.Ct. at 3257 ("[I]n reviewing Article III challenges, we have weighed a number of factors, none of which has been deemed determinative, with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary."), we conclude that the FCA does not authorize the judiciary to infringe on prosecutorial authority to a degree beyond the bounds establish in *Morrison*. The government's authority to intervene at the outset of an action is unfettered; we have seen no indication that it is difficult for the government to show good cause to intervene late; and, in view of analogous authority, judicial oversight of the government's dismissal power is unremarkable.

### 5. Conclusion.

Taken as a whole, and considering the removal issue in particular, the FCA affords the Executive Branch a degree of control over qui tam relators that is not distinguishable from the degree of control the *Morrison* Court found the Executive Branch exercises over independent counsels. Therefore, we conclude that the qui tam provisions of the FCA do not "impermissibly interfere" with the President's exercise of his constitutionally assigned duties. Nor do the provisions disrupt the "proper balance" between the branches, because, like the Ethics in Government Act, the FCA permits the Executive Branch to retain "sufficient control" over prosecutorial functions.[19] Finally, the provisions do not authorize constitutionally impermissible judicial encroachment on executive power.

### C. Appointments Clause.

■ The third constitutional question we consider is whether the qui tam provisions of the FCA violate the Appointments Clause.[20] This case does not present the usual situation raising an Appointments Clause problem— that is, where the power to appoint is placed in the hands of the wrong branch or governmental entity. In other words, this case does not present a question of improper diffusion or arrogation of appointment power. Rather, it requires us to inquire whether completely *unappointed* qui tam relators wield so much governmental power that they *must* be appointed in conformity with the Appointments Clause.

The purpose of the Appointments Clause is to limit congressional discretion to disperse the power *to appoint*, and thereby preserve the Constitution's structural integrity. *Freytag*, —— U.S. at —— – ——, —— – ——, 111 S.Ct. at 2638–39, 2641–42. Under *Buckley*, persons who are not appointed by a body with proper appointment authority, and who therefore can not be considered "Officers of the United States," may not discharge functions that are properly discharged only by "officers". 424 U.S. at 140, 96 S.Ct. at 692.

**19.** Boeing raises the specter of Congress enacting an unlimited series of qui tam provisions if this court finds the qui tam provisions in the FCA to be constitutional. However, this pure speculation about the policy choices Congress might attempt to make does not weigh into our constitutional analysis. Furthermore, it is unlikely that in other areas of civil law enforcement a similarly concrete, identifiable injury to the U.S. treasury as exists in the FCA context would exist as a basis for standing.

**20.** Art. II, § 2, cl. 2 of the U.S. Constitution provides: "The President ... shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

The test which *Buckley* provides to assess whether persons exercise authority which can only properly belong to appointed "officers" is whether those persons "exercis[e] significant authority pursuant to the laws of the United States." *Id.* at 126, 96 S.Ct. at 685. The Court held in *Buckley* that statutory provisions vesting in the Federal Election Commission "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights" violate the Appointments Clause because only officers may perform such functions. *Id.* at 140, 96 S.Ct. at 692.

The appropriate questions in this case, therefore, are whether qui tam relators exercise "significant authority" under the FCA, and whether the FCA vests in relators "primary responsibility" for enforcing the Act by litigating in the federal courts. Our answers to these questions follow logically from our determination, explained in Section III.B., that the qui tam provisions do not violate the separation of powers principle. We have concluded that the Executive Branch retains "sufficient control" of relators such that their exercise of authority to sue on behalf of the United States does not "impermissibly undermine" executive functions. In keeping with that conclusion, we find it impossible to characterize the authority exercised by relators as so "significant" that it must only be exercised by officers appointed in the manner which Article II, § 2, cl. 2 prescribes. *See Buckley*, 424 U.S. at 126, 96 S.Ct. at 685. Linking our Appointments Clause and separation of powers analyses in this manner is appropriate in light of the fact that the Supreme Court has interpreted the Appointments Clause to serve the purpose of maintaining the separation of powers in the constitutional scheme. *Freytag*, —— U.S. at ——, ——, 111 S.Ct. at 2638, 2641 ("The principle of separation of powers is embedded in the Appointments Clause."); *See*

*Buckley*, 424 U.S. at 120, 124, 96 S.Ct. at 682, 684.

Boeing and amici supporting its position argue, citing *Buckley*, that only officers of the United States may litigate on behalf of the government. We do not believe *Buckley* can fairly be read to state an unequivocal rule that only officers may exercise any prosecutorial authority in the name of the United States. Instead, *Buckley*, properly construed, directs only that persons who have "primary responsibility" and "significant authority" to enforce a law through litigation must be considered officers. *Buckley*, 424 U.S. at 126, 140, 96 S.Ct. at 685, 692.

As Kelly correctly points out, the qui tam provisions do not contravene *Buckley*'s rule. The fact that relators sue in the name of the government does not vest them with any governmental powers; they conduct litigation under the FCA with only the resources of private plaintiffs. Furthermore, relators have no greater authority to enforce the FCA than does the Attorney General, and under the terms of the statute must yield to the government's assumption of "primary responsibility" when it elects to intervene in a qui tam action. 31 U.S.C. § 3730(c)(1). When the government does not intervene, a relator retains primary responsibility for the litigation, thus presenting what may seem a close question under *Buckley*; but even in that situation, the relator's responsibility only extends to a single case, and the relator's activities can still be limited by the court upon the request of either the government or the defendant.[21] Thus, the qui tam scheme does not threaten the interest in preventing the exercise of unchecked or unbalanced government power which underlies the Appointments Clause. Moreover, the Court's central point in *Buckley* was that Congress may not arrogate power to itself by appointing officers who perform executive functions. The Court held that the Federal

---

**21.** In addition, as the district court below pointed out, a relator "is not appointed by Congress, receives no federal salary, and serves for no specified term." Order denying dismissal at 7. These factors distinguish relators from "officers". *See Auffmordt v. Hedden*, 137 U.S. 310,

327, 11 S.Ct. 103, 108, 34 L.Ed. 674 (1890) (person is not an "officer" within meaning of Appointments Clause where his "position is without tenure, duration, continuing emolument, or continuous duties").

Election Commission could not exercise the powers conferred upon it precisely because Congress exceeded its authority by vesting itself with power to appoint the commissioners. *Buckley,* 424 U.S. at 143, 96 S.Ct. at 693. Such concerns about congressional aggrandizement simply are not implicated in this case.

We conclude that a qui tam relator, who litigates only a single case, does not have "primary responsibility" within the meaning of *Buckley* for enforcing the FCA. Nor does a relator exercise authority so "significant" that the Constitution only permits an officer of the United States to exercise it. Therefore, the qui tam provisions do not violate the Appointments Clause.

### D. Due Process.

■ The final question before us is whether the qui tam provisions of the FCA violate the Due Process Clause of the Fifth Amendment. Boeing argues that the FCA violates Boeing's right not to be deprived of property without due process [22] because it permits financially interested relators to prosecute the company on behalf of the government. Boeing contends that the Act's promise of a reward to relators for successful prosecution creates a conflict of interest between a relator's desire for pecuniary gain and duty as a prosecutor performing "government functions" to seek a just and fair result. Because the government is the real party in interest, Boeing asserts, a relator must "place justice above competing objectives." Brief of Appellant at 10.

Boeing does not cite persuasive authority for its position. In one case on which Boeing relies, *Marshall v. Jerrico,* 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980), the Supreme Court did state that a "scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." *Id.* at

249–50, 100 S.Ct. at 1617. However, the Court found *no* due process violation in the case before it, in which the Court determined that prosecutors enforcing the child labor provisions of the Fair Labor Standards Act had only an exceptionally remote financial incentive for securing civil penalties. *Id.* at 250, 100 S.Ct. at 1617. Thus, the Court explicitly declined to state the "limits there may be on a financial or personal interest of one who performs a prosecutorial function." *Id.* In addition, the Court noted that "[p]rosecutors need not be entirely 'neutral and detached'.... In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law. The constitutional interests ... are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive for securing civil penalties." *Id.* at 248–49, 100 S.Ct. at 1616. Boeing's contention that the *Marshall* Court "strongly suggested" that the Due Process Clause prohibits civil prosecutions by financially interested prosecutors is exaggerated, and does not support a finding of a due process violation here.

Also, Boeing's reliance on *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987), is misplaced. The Court held in *Young* that courts generally may appoint private attorneys to prosecute criminal contempt charges, but that the district court in the particular case before it erred in appointing attorneys who were counsel for an interested party in the underlying litigation. *Id.* at 793, 802, 107 S.Ct. at 2130, 2135. However, only Justice Blackmun in a concurring opinion stated that the error amounted to a due process violation. *Id.* at 815, 107 S.Ct. at 2141 (Blackmun, J., concurring). *Young,* in addition, is distinguishable from the present case in that it involved *criminal* prosecution, and therefore arguably required a higher level of prosecutorial disinterest than would be necessary in a civil enforcement action under the FCA. *See id.* at 808, 107 S.Ct. at 2138 (noting criminal nature of litigation in question).

**22.** The Fifth Amendment to the U.S. Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

Furthermore, the type of conflict of interest at issue in *Young* is simply not extent in the qui tam situation, where private and public goals are congruent. In *Young*, the Court observed that a private attorney appointed to prosecute a criminal contempt action "is appointed solely to pursue the public interest in vindication of the court's authority ... [and] therefore certainly should be as disinterested as a public prosecutor who undertakes such a prosecution." *Id.* at 804, 107 S.Ct. at 2136. But in the FCA context, Congress has created a scheme in which the interests of the private prosecutor (that is, the relator) coincide with the public interest in remedying harm to the federal treasury. Under the explicit terms of the Act, a qui tam action is taken on behalf of *both* the government and the relator, indicating that the two share a single interest in successful litigation. *See* 31 U.S.C. § 3730(b). Indeed, the only private interest at stake in a qui tam action is the interest which Congress has created in a reward for successful prosecution; thus the public's interest in successfully enforcing the FCA and the relator's private interest are intertwined rather than conflicting.

Moreover, contrary to Boeing's suggestion, it is not at all clear that qui tam relators are bound to fulfill the same type of public duty as government prosecutors. The statutory terms of the FCA do not impose such a duty, nor do relators owe a duty by virtue of holding a public "office". Furthermore, the fact that relators sue in the name of the United States does not mean that they wield governmental powers and therefore owe the same type of duty to serve the public interest as government prosecutors. First, the fact that relators sue in the name of the government is significant only with respect to their standing to sue; based on the terms of the statute, in no way does this fact otherwise

affect the conduct of qui tam litigation. Second, unlike public prosecutors, relators do not have the "power to employ the full machinery of the state in scrutinizing any given individual." *Young*, 481 U.S. at 814, 107 S.Ct. at 2141; *see id.* at 811, 107 S.Ct. at 2140 ("terrible array of coercive methods" is available to prosecutors, including police investigation and interrogation, warrants, immunized informers and agents, authorized wiretapping, civil investigatory demands, and enhanced subpoena power.) Qui tam relators pursue their claims essentially as private plaintiffs, except that the government may displace a relator as the party with primary authority for prosecuting an action. Thus, qui tam litigation does not implicate due process concerns.

## IV. CONCLUSION

We conclude that the qui tam provisions of the False Claims Act do not conflict with Article III of the Constitution, nor violate the principle of separation of powers, the Appointments Clause, or the Due Process Clause.[23] Accordingly, we affirm the district court's denial of Boeing's motion to dismiss.

AFFIRMED.

---

**23.** The parties and amici devote considerable attention to arguments concerning the historical pedigree of qui tam actions. The two sides in this case present conflicting portraits of that pedigree. Obviously, "[s]tanding alone, historical patterns cannot justify contemporary violations of constitutional guarantees." *Marsh v. Chambers*, 463 U.S. 783, 790, 103 S.Ct. 3330, 3335, 77 L.Ed.2d 1019 (1983). But historical factors can affect a court's decision where there is significant evidence of an "unambiguous and unbroken history" of practice dating from the framing of the Constitution. *Id.* at 790–92, 103 S.Ct. at 3335–36. The evidence presented by those urging affirmance in this case does not appear to rise to that level. In any event, because we find no constitutional violations here, we need not consider the historical arguments at all.