FILED
COURT OF APPEALS
DIVISION II

2013 JUN 19 AM 8: 31

STATE OF WASHINGTON

BY_____

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re Estate of | No. 42933-1-II |
| MARK EUGENE DUXBURY, | |
| Deceased. | |
| SOJOURNER T. DUXBURY, | |
| Appellant, | |
| and | |
| CHINYELU DUXBURY, | PUBLISHED OPINION |
| Respondent. | |

HUNT, J. — Sojourner T. Duxbury[1] appeals the Pierce County Superior Court's order

concluding that her deceased father's (Mark Eugene Duxbury) federal "'qui tam action'"[2] under

the False Claims Act (FCA)[3] and any future proceeds[4] from it are community property, which

---

[1] Intending no disrespect, we refer to the parties by their first names for clarity.

[2] Br. of Appellant at 2.

[3] 31 U.S.C. § 3730. As we explain more fully in the analysis section of this opinion, a civil qui tam action serves as the "'primary litigative tool for combating fraud'" against the federal government. *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 745 (9th Cir. 1993) (quoting S. REP. NO. 99-345, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266). The FCA authorizes both the United States Attorney General and private persons to bring civil actions to enforce the statute. 31 U.S.C. § 3730(a)-(b). Although the FCA provides that actions brought by private persons are "for the person *and* for the United States Government," a private person still sues in the "name of the Government." 31 U.S.C. § 3730(b) (emphasis added).

will pass entirely to her stepmother, Chinyelu Duxbury, under Washington's intestacy statute; Sojourner also appeals the superior court's denial of her motion to reconsider this decision. Sojourner argues that the superior court erred in concluding that her father's qui tam action is community property because (1) he acquired a property interest in the qui tam action when he learned facts material to his qui tam right of action, which events occurred before his 2001 marriage to Chinyelu; and (2) if he did not acquire a property interest in the qui tam action until he filed his qui tam lawsuit in 2003 (after marrying Chinyelu), the qui tam action should be considered his separate property because they were not acquired by "onerous title"[5] through the labor and industry of the marriage.

We hold that the superior court properly characterized Mark's qui tam action as community property because he obtained a property interest in this action after marriage, when he filed his qui tam lawsuit and served a copy of his complaint and supporting evidence on the federal government in 2003. Accordingly, we affirm; and we deny both parties' requests for attorney fees.

## FACTS

### I. "QUI TAM" ACTION IN FEDERAL COURT IN MASSACHUSETTS

Mark Eugene Duxbury was employed by Ortho Biotech Products, LP (OBP) from 1992 to 1998; eventually, he became a Regional Key Account Specialist for OBP's Western Division Oncology sales force, responsible for promoting and selling OBP's drug Procrit® in the Western

---

[4] All later references to the "qui tam action" in this opinion include any future proceeds of this action.

[5] Br. of Appellant at 16.

United States. During the course of his employment, Mark learned facts related to what he considered an illegal OBP "'kickback scheme,'" which (1) involved OBP's giving medical providers and hospitals "kickbacks"[6] to induce them to prescribe Procrit® to patients; and (2) resulted in the providers and hospitals submitting false claims to Medicare. Clerks Papers (CP) at 1, 8. Although Mark learned about this OBP "kickback scheme" during his employment, he did not report the kickbacks or the false Medicare claims to the federal government at that time.

In February 2001, after he stopped working for OBP, Mark married Chinyelu. CP at 1, 71. In November 2003, Mark (1) first notified the United States Attorney General of the "kickback scheme" that he had learned about while working for OBP, and (2) filed a federal civil action against OBP in Massachusetts under the "qui tam" provisions of the federal FCA, 31 U.S.C. § 3730. CP at 1. Apparently, Mark's qui tam action is still pending in federal court. *See* CP at 72.

## II. PROBATE ACTION IN PIERCE COUNTY

Mark died intestate in October 2009; he was survived by his wife, Chinyelu, and his daughter from a previous marriage, Sojourner. Chinyelu was appointed personal representative of Mark's estate; as the estate's personal representative, she was also substituted as the "relator"[7] for his federal qui tam action. In 2010, Mark's estate filed an inventory of estate assets in Pierce County Superior Court, which listed Mark's qui tam action and all other property in the estate as

---

[6] These "kickbacks" included free samples, off-invoice discounts, rebates, consulting fees, educational grants, payments to participate in studies or trials, and advisory board honoraria.

[7] "Relators" are private persons who file civil actions for violations of the FCA under the Act's qui tam provisions. 31 U.S.C. § 3730(b)(1).

"community property."[8]  CP at 5.  At the time of the estate inventory, the value of Mark's qui

tam action was "[u]nknown," although it is now believed to be worth at least $150 million if

successful.  CP at 6.  The other estate assets total $22,003.38 in value.

A.  Sojourner's Motion for Order that Qui Tam Action Is Separate Property

In July 2011, Sojourner moved for a Pierce County Superior Court order that Mark's qui

tam action is his separate property, one half of which she is entitled to inherit under

Washington's intestacy statute.  RCW 11.04.015(2)(a).  Sojourner argued that (1) under

Washington law, a cause of action and any resulting property interest in it "accrues" when a

person learns about material facts necessary to the action; and (2) because Mark learned about

the material facts necessary to his qui tam action during his employment with OBP (1992-1998),

before he married Chinyelu, the qui tam action is his separate property.  CP at 3.

Opposing Sojourner's motion, Chinyelu argued that (1) a relator's property interest in a

qui tam action differs from other causes of action, such as personal injury actions, because the

federal government, not the relator, is the injured party; (2) unlike other causes of action, a

relator's property interest in a qui tam action is merely a statutory "fee," which the relator

"earns" by following FCA requirements—i.e., by disclosing the alleged fraud to the federal

government and filing a qui tam lawsuit; and (3) because Mark did not disclose OBP's "kickback

scheme" to the federal government and file his qui tam lawsuit until after he married Chinyelu,

his qui tam action is community property.  CP at 36.  The superior court initially granted

Sojourner's motion and ruled that Mark's qui tam action is separate property.

---

[8] If characterized as community property, any future proceeds from Mark's qui tam action would
pass entirely to Chinyelu as Mark's surviving spouse under RCW 11.04.015(1)(a), Washington's
intestacy statute.

## B. Chinyelu's Motion for Revision

Chinyelu moved the superior court for revision. Analogizing to case law involving a relator's standing to sue,[9] Chinyelu argued that (1) the FCA's qui tam provisions operate as an enforceable "unilateral contract," which is not accepted or formed until a relator fully performs the notice and filing requirements of the statute; (2) once a relator completes these statutory requirements, the federal government "assigns" part of its fraud claim to the relator, thus creating the relator's property interest in the cause of action; and (3) because Mark did not perform the FCA's notice and filing requirements until 2003, he did not acquire a property interest in the qui tam action until after he married Chinyelu, making the action community property. CP at 54, 62.

Sojourner again responded that (1) the relevant time period for evaluating when a qui tam action accrues and when a relator obtains a resulting property interest in the action is the date the relator first "acquires knowledge of the facts supporting the FCA claim," and (2) this date should determine the cause of action's separate or community property character. CP at 58. Accepting Chinyelu's unilateral contract theory for determining the date that Mark acquired a property interest in the qui tam action, the superior court granted Chinyelu's motion for revision and ruled that Mark's qui tam action is community property that passes to Chinyelu under Washington's intestacy statute.

## C. Sojourner's Motion for Reconsideration

Sojourner moved for reconsideration. The superior court denied the motion, again relying on Chinyelu's unilateral contract theory. Sojourner appeals.

---

[9] *See* CP at 62-63 (citing *Kelly*, 9 F.3d at 745).

ANALYSIS

Sojourner argues that the superior court erred in concluding that Mark's federal FCA qui tam action is community property because (1) he "acquired" a property interest in this action before his marriage to Chinyelu, when he first learned facts material to his qui tam right of action and when his cause of action first "accrue[d]" for statute of limitations purposes (not when he filed his qui tam lawsuit in 2003, after marrying Chinyelu); and (2) if Mark did not acquire a property interest in the qui tam action until he filed his lawsuit in 2003, we should still characterize this action as his separate property because he did not acquire it by "onerous title" through the labor and industry of his marriage. Br. of Appellant at 5, 11, 13, 16.

Chinyelu again responds that the superior court properly characterized Mark's qui tam action as community property because Mark did not obtain a property interest in the action until he filed his qui tam lawsuit and served a copy of his complaint and supporting evidence on the federal government in 2003, after he had married her. We agree with Chinyelu and the superior court.

I. STANDARD OF REVIEW

Where, as here, the relevant facts are undisputed and the parties dispute only the legal effects of those facts, our standard of review is de novo. *In re Estate of Earls,* 164 Wn. App. 447, 450, 262 P.3d 832 (2011). We also review questions of statutory interpretation de novo. *Earls,* 164 Wn. App. at 450. If a statute is susceptible to an interpretation that may render it unconstitutional, we will adopt a construction that sustains the statute's constitutionality if such construction is consistent with the statute's purposes. *In re Pers. Restraint of Williams,* 121

Wn.2d 655, 665, 853 P.2d 444 (1993); *In re Det. of Chorney*, 64 Wn. App. 469, 477, 825 P.2d 330 (1992). Such is the case here.

## II. BASIC COMMUNITY PROPERTY RULES

When evaluating the parties' arguments, we begin by reviewing Washington's basic community property rules. The character of property as separate or community property is determined at the date of acquisition; and it depends, in part, on whether the property was acquired by community funds and community credit or by separate funds and separate credit. *In re Estate of Borghi*, 167 Wn.2d 480, 484, 219 P.3d 932 (2009); *Cummings v. Anderson*, 94 Wn.2d 135, 139, 614 P.2d 1283 (1980). Once the separate or community character of property is established, we presume that the property retains its character absent sufficient "'direct and positive evidence to the contrary.'" *Borghi*, 167 Wn.2d at 484 (quoting *Guye v. Guye*, 63 Wash. 340, 352, 115 P. 731 (1911)); *see also Cummings*, 94 Wn.2d at 139-40 ("The character thus established remains fixed, unless changed by deed, due process of law, or the working of some form of estoppel.").

"Separate property" is statutorily defined as encompassing "[p]roperty and pecuniary rights," including all rents, issues, and profits thereof, that (1) a spouse owned before marriage; or (2) he or she acquired after marriage by gift, bequest, devise, descent, or inheritance. RCW 26.16.010, .020; *In re Marriage of Short*, 125 Wn.2d 865, 870-71, 890 P.2d 12 (1995). Property that does not fall within this definition of separate property and that is acquired during marriage is presumed to be community property. RCW 26.16.030; *Short*, 125 Wn.2d at 870. The law favors characterization of property as community property unless there is no question as to its

separate character. *In re Marriage of Mueller*, 140 Wn. App. 498, 504, 167 P.3d 568 (2007), *review denied*, 163 Wn.2d 1043 (2008).

Enforceable contract rights and contingent future interests, such as lawsuit proceeds and fee arrangements, are all property interests subject to characterization as separate or community property for distribution purposes. *In re Marriage of Estes*, 84 Wn. App. 586, 590, 929 P.2d 500 (1997); *see also In re Marriage of Brown*, 100 Wn.2d 729, 737-39, 675 P.2d 1207 (1984); *In re Marriage of Griswold*, 112 Wn. App. 333, 344, 48 P.3d 1018 (2002). Here, the parties do not dispute that Mark's qui tam action is a property interest that is subject to distribution as separate or community property.

## III. DATE WHEN MARK ACQUIRED "PROPERTY INTEREST" IN FEDERAL QUI TAM ACTION

Instead, the parties disagree about *when* Mark acquired his property interest in his qui tam action. This determination, in turn, affects the property interest's separate or community property character and ultimately who is entitled to the qui tam action's potential future damages and/or settlement award.

### A. Soujourner's Argument

According to Sojourner, Mark "acquired" a property interest in his qui tam cause of action when he first "learned" about or "acquire[d] knowledge" of OBP's fraud because that date triggered the cause of action's statute of limitations. Br. of Appellant at 11, 14. Sojourner is correct that, under existing case law, Mark's cause of action "accrued" and he obtained the right to sue on his qui tam action when he first learned about OBP's fraud. *See*

*Jones v. Jacobson*, 45 Wn.2d 265, 269, 273 P.2d 979 (1954).[10] Sojourner is also correct, in part at least, that the cause of action's statute of limitations arguably began to run at this point. *Browning v. Howerton*, 92 Wn. App. 644, 651, 966 P.2d 367 (1998) (for damages actions based on fraud, the statute of limitations starts running when "the *aggrieved party* discovers, or should have discovered, the fact of fraud by due diligence *and sustains some actual damage as a result*.") (Emphasis added)[11]; *see also Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1396 (9th Cir. 1986) ("Under federal law a cause of action accrues when the plaintiff is aware of the wrong and can successfully bring a cause of action."). Sojourner does not, however, persuade us that the starting of the statute of limitations period is synonymous with the date that Mark acquired a property interest in his FCA qui tam action for purposes of separate/community property characterization.

Under the FCA's statute of limitations, civil actions may not be brought (1) more than six years after the date the violation was committed; or (2) more than three years after the date when "facts material to the right of action are known or reasonably should have been known" by an

---

[10] In *Jones*, our Washington Supreme Court held:

> "*Statutes of limitation commence to run against a cause of action from the time it accrues, or from the time when the holder thereof has the right to apply to a court for relief*, and to commence proceedings to enforce his rights. The time when a cause of action has accrued within the statutes of limitations means the time when [the] plaintiff first became entitled to sue."

*Jones v. Jacobson*, 45 Wn.2d at 269 (emphasis added) (quoting *Young v. City of Seattle*, 30 Wn.2d 357, 361, 191 P.2d 273 (1948)).

[11] Here, we need not address whether Mark is the "aggrieved party" under *Browning* for purposes of our holding in this qui tam action related appeal. We note, however, that Mark does not appear to have suffered an injury or to have incurred damages as a result of OBP's fraud, which was committed against the federal government. Thus in our view for purposes of this appeal, the "aggrieved party" arguably remains the federal government, which always retains the right to intervene in Mark's qui tam action.

official of the United States Government, but in no event more than ten years after the date on which the violation was committed. 31 U.S.C. § 3731(b)(1)-(2). The Ninth Circuit has interpreted this latter tolling provision as applying to qui tam action relators as well as to the federal government. *United States ex rel. Hyatt v. Northop Corp.*, 91 F.3d 1211, 1216 (9th Cir. 1996). The record before us contains evidence that the FCA's six-year statute of limitations has already limited the actionable period for Mark's qui tam action, foreclosing his ability to sue based on OBP's fraudulent activity occurring before 1997. But, as we describe in more detail below, because of the unique nature of qui tam actions, which allow private persons to sue for injuries to the federal government, the qui tam cause of action's statute-of-limitations accrual date is not the same date that Mark acquired a property interest in his qui tam lawsuit.

## B. Chinyelu's Argument

Chinyelu argues that we should hold that Mark acquired a property interest in his qui tam action in 2003, when he filed his qui tam lawsuit and served a copy of his complaint and supporting evidence on the federal government; she contends that this result would be consistent with the FCA's purpose of encouraging relators to disclose fraud claims to the federal government. According to Chinyelu, (1) a relator acquires a property interest in a qui tam action differently than he acquires a property interest in other causes of action because he is not the injured party; (2) the date that a relator learns about an alleged fraud and a qui tam cause of action accrues for statute of limitations purposes is different from the date when the relator obtains a "property interest" in the qui tam action because the relator is not the injured party and does not have an inherent right to the action's potential proceeds; and (3) thus, before a relator has a property interest in a qui tam action, he must essentially form a "unilateral contract" with

the federal government (which contract he accepts by revealing the alleged fraud to the federal government and filing his lawsuit) and be assigned a portion of the government's potential damages and/or settlement award. Br. of Resp't at 5, 6 (quoting *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 748 (9th Cir. 1993)). Although there is no case law directly on point, we find Chinyelu's argument persuasive.

### C. Federal Qui Tam Actions

#### 1. Historical overview and general rules

Originating in England at the end of the 13th century, qui tam actions were prevalent in North America and England during colonial times. *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774-76, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000). According to the United States Supreme Court, the early English qui tam statutes fell into two categories: (1) those that allowed injured parties to sue in vindication of their own interests[12]; and (2) those that allowed "informers" to "obtain a portion of the [government's] penalty *as a bounty for their information*, even if they had not suffered an injury themselves." *Stevens*, 529 U.S. at 775 (emphasis added). The English colonists brought this qui tam tradition to North America and enacted a considerable number of informer statutes around the time of our Constitution's creation. *Stevens*, 529 U.S. at 776.

The federal government originally enacted the FCA in 1863. *Stevens*, 529 U.S. at 768. This statute is one of only a few extant American laws creating civil qui tam actions; it serves as

---

[12] *Stevens*, 529 U.S. at 775 (citing STATUTE PROVIDING A REMEDY FOR HIM WHO IS WRONGFULLY PURSUED IN THE COURT OF ADMIRALTY, 2 Hen. IV, ch. 11 (1400)).

the "'primary litigative tool for combating fraud' against the federal government."[13] *Stevens*, 529 U.S. at 768; *Kelly*, 9 F.3d at 745 (quoting S. REP. NO. 99-345, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266). To meet the FCA's goal of combating fraud, the FCA authorizes both the United States Attorney General and private persons to bring civil actions to enforce the statute. 31 U.S.C. § 3730(a)-(b).

If a private person brings an action under section 3730(b) of the FCA, the lawsuit is called a "qui tam" action and the person who brings such action is referred to as a "relator" or "informer." *Kelly*, 9 F.3d at 745-46. Although the FCA provides that such actions are "for the person *and* for the United States Government," a private person bringing such action still sues in the "name of the Government." 31 U.S.C. § 3730(b)(1) (emphasis added). The relator bringing a qui tam action must also serve on the federal government a copy of his complaint and a written disclosure of substantially all material evidence and information he possesses; the government then has 60 days to investigate and to decide whether to intervene in the action. 31 U.S.C. § 3730(b)(2); *Kelly*, 9 F.3d at 746.

If the federal government intervenes in the relator's qui tam action, the government assumes the "primary responsibility for prosecuting the action"; it is not bound by any act of the relator, although the relator has the right to continue as a party to the action. 31 U.S.C. § 3730(c)(1). If, however, the government declines to intervene, the relator has "the right to conduct the action." 31 U.S.C. § 3730(c)(3). Nevertheless, the federal government may request

---

[13] The FCA imposes civil liability on "'[a]ny person'" who "'knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval.'" *Stevens*, 529 U.S. at 768 (alterations in original) (quoting 31 U.S.C. § 3729(a)).

that the relator serve copies of all pleadings and deposition transcripts on the government; and it may intervene at a later date on a showing of "good cause." 31 U.S.C. § 3730(c)(3).

The FCA also provides for a range of possible awards for successful qui tam relators. *Kelly*, 9 F.3d at 747. If the government intervenes in a successful qui tam action, the relator will receive between 15 and 25 percent of the proceeds of the action and/or settlement, depending on the extent to which he "substantially contributed" to the action's prosecution. 31 U.S.C. § 3730(d)(1). If the government does not intervene and the action is successful, the relator will receive between 25 and 30 percent of the proceeds of the action and/or settlement. 31 U.S.C. § 3730(d)(2). Regardless of whether the government intervenes, the relator also receives an amount for reasonable expenses and attorney fees and costs. 31 U.S.C. § 3730(d)(1)-(2). These FCA notice, filing, and award provisions demonstrate that (1) encouraging relators to disclose fraud claims and giving the government an opportunity to investigate and to decide whether to intervene are key purposes of a qui tam action; and (2) the federal government remains the real party in interest in any qui tam action, regardless of whether the government formally intervenes and takes over prosecution of the case.

### 2. Federal court interpretation of relator's standing to sue

The federal courts have not expressly determined when a relator obtains a property interest in a qui tam action and his portion of the action's future proceeds. Nevertheless, several federal opinions analyzing a relator's standing to sue in qui tam actions provide some insight into how we might construe the origins and character of a relator's property interest in a qui tam action.

At issue in *United States ex rel. Kelly v. Boeing Co.* was the relator's ability to demonstrate constitutional standing requirements, which was a jurisdictional requirement affecting the federal court's ability to hear the relator's qui tam action. *See Kelly*, 9 F.3d at 747-48; *Stevens*, 529 U.S. at 771. The defendants argued that the relator lacked standing under Article III of the United States Constitution because the defendant's fraud had been committed against the federal government and its treasury, not against the relator personally, and, therefore, the relator had not suffered an "injury in fact."[14] *Kelly*, 9 F.3d at 748. The Ninth Circuit held that a relator who had not suffered a direct injury in fact could establish Article III standing because (1) Congress intended the FCA's qui tam provisions to "assign" a portion of "the government's fraud claims" to qui tam relators; and (2) this assignment allowed the relators to "stand[ ] in the shoes of the government" and obtain Article III standing. *Kelly*, 9 F.3d at 748.

The Ninth Circuit further explained that the FCA's qui tam provisions set forth a "unilateral contract" for partial assignment of the government's fraud claim and that this contract is not fully formed until the qui tam relator files his qui tam lawsuit. *Kelly*, 9 F.3d at 748 ("Under this theory of standing, the FCA's qui tam provisions operate as an enforceable unilateral contract. *The terms and conditions of the contract are accepted by the relator upon filing suit.*") (Emphasis added). Although the Ninth Circuit did not elaborate on the terms and conditions of this "unilateral contract," we view this "assignment" theory for Article III standing

---

[14] Article III standing requires that the complaining party demonstrate (1) an "'injury in fact'"—a harm that is both "'concrete'" and "'actual and imminent, not conjectural or hypothetical'"; (2) causation; and (3) redressability. *Stevens*, 529 U.S. at 771-72 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990)).

as implicitly recognizing that a relator's *only* property interest in a qui tam action is the *potential* portion of the government's fraud claim and its statutorily-defined percentage of future proceeds that is assigned to him when he files his qui tam lawsuit and serves a copy of his complaint and supporting evidence on the federal government. In other words, a relator's property interest in a qui tam action is not *created* until the relator "accepts" the government's contractual offer, files his qui tam lawsuit, and serves his complaint and supporting evidence on the government, thereby triggering the government's assignment of a portion of its fraud claim and future proceeds to the relator.

In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, the United States Supreme Court adopted this assignment theory for Article III standing, noting, (1) "The FCA can reasonably be regarded as effecting a *partial assignment* of the Government's damages claim" to a qui tam relator; and (2) there is an

> adequate [standing] basis for the relator's suit for his bounty [i.e., his portion of the qui tam action's proceeds] in the *doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor.*

*Stevens*, 529 U.S. at 773 (emphasis added). The Supreme Court did not expressly state when this partial assignment of the government's FCA damages claim occurs or when a relator's property interest in his portion of the damages claim and proceeds is created. But the Court did note that historically a relator's property interest does not arise until *after* he files his qui tam lawsuit:

> Blackstone noted, with regard to English qui tam actions, that *"no particular person, A or B, has any right, claim or demand, in or upon [the bounty], till after action brought,"* and that the bounty constituted an "inchoate imperfect degree of property . . . [which] is not consummated till judgment."

15

*Stevens*, 529 U.S. at 773 n.3 (emphasis added) (alterations in original) (quoting 2 WILLIAM BLACKSTONE, COMMENTARIES *437). We find this reasoning both (1) persuasive for determining when a relator obtains a property interest in a qui tam action, and (2) consistent with the FCA's purpose of encouraging relators to disclose fraud claims to the federal government and to give the federal government the opportunity to investigate and to decide whether to intervene.

### 3. Application of federal law to state law property interest characterization

We further note that the Supreme Court's *Vermont Agency of Natural Resources. v. United States ex rel. Stevens* rationale provides a reasonable construction of the FCA when read in tandem with other provisions in the qui tam section. For example, 31 U.S.C. § 3730(b)(5), provides:

> When a person brings an action under this subsection, *no person* other than the Government may . . . *bring a related action based on the facts underlying the pending action.*

(Emphasis added). This provision forecloses other potential relators, who might also know about a company's fraud, from filing their own qui tam actions once the first qui tam relator informs the government about the alleged fraud and files his qui tam lawsuit.

If we accept Sojourner's argument that Mark had a property interest in his qui tam action from the moment he first acquired "knowledge"[15] about OBP's fraud, it is possible that other OBP employees also knew about the fraud; if so, these other employees' mere knowledge would also have given them a simultaneous property interest in their own qui tam action and FCA statutorily-defined proceeds. If that were the case, this FCA provision prohibiting these others'

---

[15] Br. of Appellant at 11.

qui tam actions could potentially effect unconstitutional "takings" of these employees' property by divesting them of the ability to bring their own qui tam actions once Mark filed his.[16] 31 U.S.C. § 3730(b)(5). Not only would such a result be absurd, but also it would make this statute susceptible to an unconstitutional interpretation.

The law is well settled that we should adopt a construction that sustains the statute's constitutionality if such construction is also consistent with the statute's purposes. *Williams*, 121 Wn.2d at 665; *Chorney*, 64 Wn. App. at 477. Therefore, we reject Sojourner's interpretation, adopt instead the Supreme Court's *Vermont Agency of Natural Resources v. United States ex rel. Stevens* rationale for when a relator acquires a property interest in a FCA qui tam action, and read the FCA in a manner that sustains its constitutionality.

Accordingly, we hold that (1) the FCA's qui tam provisions operate as a unilateral contract for a partial assignment of the federal government's damages claim emanating from the relator's filing of a qui tam action; (2) a relator does not have a property interest in a qui tam action or a portion of its future proceeds until he files his qui tam lawsuit and serves his complaint and supporting evidence on the federal government; (3) under the FCA, Mark did not acquire a property interest in his qui tam action until he filed his qui tam lawsuit and served his complaint and supporting evidence on the federal government in 2003; (4) because Mark did not complete these FCA requirements until after he was married to Chinyelu, his qui tam action is

---

[16] The Fifth and Fourteenth Amendments to the United States Constitution prohibit the government from depriving a person of property without "due process of law." U.S. CONST. amends. V, IVX. The Washington Constitution also provides that "[n]o private property shall be taken or damaged for public or private use without just compensation having first been made." WASH. CONST. art. I, § 16.

presumptively community property;[17] and (5) the superior court did not err in concluding that Mark's qui tam action is community property that passes to Chinyelu under Washington's intestacy statute.[18]

## IV. ONEROUS TITLE OF MARRIAGE

In the alternative, Sojourner argues that if Mark did not obtain a property interest in his qui tam action until he filed his qui tam lawsuit in 2003, we should nonetheless consider his qui tam action to be his separate property because they were not acquired by "onerous title" through the labor and industry of the marriage. Br. of Appellant at 16-19. Again, we disagree.

---

[17] RCW 26.16.030; *Short*, 125 Wn.2d at 870.

[18] We further note that our holding is consistent with other state court opinions involving somewhat similar facts. Both Texas and California have held that federal qui tam actions filed during marriage are a "contingent future interest" and divisible as community property. *D. B. v. K.B.*, 176 S.W.3d 343, 349 (Tex. App. 2004) (holding appellant possessed contingent future interest in qui tam award during marriage and "earned" the award by discovering fraud, filing qui tam lawsuit, and providing government with information); *In re Marriage of Biddle*, 52 Cal. App. 4th 396, 400, 60 Cal. Rptr. 2d 569 (1997) (holding qui tam action is contingent future interest and divisible as community property where spouse both discovered fraud and filed qui tam lawsuit during marriage).

These Texas and California cases, however, differ from the instant case in one critical respect: In the Texas and California cases, the relator both *discovered* the fraud and *filed* the qui tam lawsuit during marriage; whereas Mark discovered the fraud before marriage and only filed his lawsuit during marriage. It is not clear from the Texas and California opinions whether the relator's discovery of the fraud during marriage was a necessary component to the courts' conclusion that the qui tam action and its future proceeds were community property. Nevertheless, we find compelling the Texas and California courts' characterization of the property right as a "contingent future interest," contingent on the relator's successfully prosecuting his qui tam action and obtaining a judgment and/or settlement from the defendant. Our courts similarly characterize contingent future interests as property interests that are subject to distribution as separate or community property. *See, e.g., Estes*, 84 Wn. App. at 590 (considering contingency fees in lawsuit a contingent future interest); *In re Marriage of Leland*, 69 Wn. App. 57, 71, 847 P.2d 518, *review denied*, 121 Wn.2d 1033 (1993) (A contingent future interest is property with value, no matter how improbable the contingency).

As we have previously explained, RCW 26.16.030 provides that property "acquired" by either spouse after marriage is presumed community property unless it is acquired or owned as prescribed in RCW 26.16.010 and .020, defining separate property. RCW 26.16.030; *Short*, 125 Wn.2d at 870. In *Brown*, the Washington Supreme Court further refined this definition, stating that, aside from gifts to the community, "community property consists *only* of that which is *acquired by onerous title*, or in exchange for other community property." *Brown*, 100 Wn.2d at 737-38 (emphasis added) (citing W. deFuniak & M. Vaighn, *Principles of Community Property* § 82, at 201 (2d ed 1971)). Under this "onerous title" theory, community property "encompass[es] wages and other *property acquired through the toil, talent, or other productive faculty of either spouse*, but not compensations for personal injury." *Brown*, 100 Wn.2d at 737 (emphasis added).

Sojourner argues that (1) under this new "onerous title" theory of community property, Mark's qui tam action should be considered separate property because he merely "share[d] information] with the government"; and (2) thus, his qui tam action is not the result of the "'toil, talent, or [other] productive fac[u]lty'"[19] of the marriage. Br. of Appellant at 16. We disagree. Sojourner overlooks that virtually *all* actions necessary to prosecute Mark's qui tam action for the six years before he died—including the labor and expenses involved in his hiring an attorney, providing information to the government, filing the necessary pleadings, paying court costs and fees, and arguably responding to discovery requests and additional pleadings from OBP—were all funded by the marital community and performed as part of its toil, talent, and productive

---

[19] Br. of Appellant at 19 (quoting *Brown*, 100 Wn.2d at 737).

faculty. Therefore, Sojourner's alternative argument fails. We reiterate that the superior court did not err in concluding that Mark's qui tam action is community property.

## V. ATTORNEY FEES

Sjourner and Chinyelu both request attorney fees on appeal. RAP 18.1 allows us to award reasonable attorney fees where (1) they are allowed by "applicable law," such as a statute, contract, or recognized ground in equity that provides for such fees; and (2) the parties request the fees in a separate section of their opening briefs. RAP 18.1(a)-(b); *Humphrey Indus., Ltd. v. Clay St. Assocs., LLC*, 176 Wn.2d 662, 676, 295 P.3d 231 (2013); *Dice v. City of Montesano*, 131 Wn. App. 675, 693, 128 P.3d 1253 (2006). Sjourner follows this rule, arguing that we should award her attorney fees under RCW 11.96A.150.[20] But she is not the prevailing party on appeal; therefore, we decline to exercise our discretion to award her attorney fees.

Contrary to, RAP 18.1(a)'s requirement, Chinyelu's brief does not direct us to any statute, contract, or other "applicable law" on which to base an award of attorney fees to her on appeal. Instead, she argues generally that attorney fees are allowed based on "overwhelming case law support" for her argument, without citing any of this case law or how the law might

---

[20] In probate matters, RCW 11.96A.150(1) gives a trial or appellate court discretionary authority to award attorney fees and costs to any party to the proceedings and "in such amount and . . . manner as the court determines to be equitable." RCW 11.96A.150(1); *In re Estate of Black*, 116 Wn. App. 476, 488-89, 66 P.3d 670 (2003). In exercising its discretion, the court may consider "any and all factors that it deems to be relevant and appropriate," which factors may but need not include whether the litigation benefits the estate or trust involved. RCW 11.96A.150(1).

enable us to award her attorney fees. Br. of Resp't at 21. Because Chinyelu fails to follow the requirements of RAP 18.1(a)-(b), we deny her request for attorney fees on appeal.

We affirm the superior court's order that Mark's qui tam action is community property that passes to Chinyelu under Washington's intestacy law. And we deny both parties' requests for attorney fees.

_____
Hunt, J.

We concur:

_____
Johanson, A.C.J.

_____
Quinn-Brintnall, J.