FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ISLAND INDUSTRIES, INC.,
Relator,

              *Plaintiff-Appellee*,
and

UNITED STATES OF AMERICA, ex
rel. Island Industries, Inc.,

              *Plaintiff*,

  v.

SIGMA CORPORATION,

              *Defendant-Appellant*,

 and

VANDEWATER INTERNATIONAL,
INC.; NEIL REUBENS; ANVIL
INTERNATIONAL, LLC; SMITH
COOPER INTERNATIONAL;
ALLIED RUBBER AND GASKET
COMPANY; JOHN DOES, 1-10,

              *Defendants*.

No. 22-55063

D.C. No.
2:17-cv-04393-
RGK-KS

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted January 10, 2023
Submission Withdrawn March 27, 2023
Resubmitted June 23, 2025
Pasadena, California

Filed June 23, 2025
Amended August 21, 2025

Before:  Michelle T. Friedland and Mark J. Bennett, Circuit Judges.[*]

Order;
Opinion by Judge Friedland

## SUMMARY[**]

### False Claims Act

The panel affirmed the district court's judgment in a case in which a jury found Sigma Corp. liable under the False Claims Act for knowingly making false statements on

---

[*] Judge Paul J. Watford, who was a member of the panel at the time the case was argued, left the court on May 31, 2023.  In accordance with General Order 3.2(h), this opinion is issued by the remaining panel members as a quorum pursuant to 28 U.S.C. § 46(d).

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

customs forms to avoid paying tariffs on some of its imports from China.

Island Industries, Inc., filed suit under the False Claims Act, alleging that Sigma made two types of false statements on customs forms to evade antidumping duties that applied to welded outlets. Island alleged that Sigma (1) declared that the products it was importing were not subject to antidumping duties and (2) described the products as steel couplings even though it marketed them to customers as welded outlets. The jury returned a verdict in favor of Island. Meanwhile, upon Sigma's and two of its codefendants' requests for a scope ruling, the Department of Commerce ruled that Sigma's and the other companies' welded outlets fell within the scope of the "China Order," an antidumping duty order covering certain carbon steel butt-weld pipe fittings imported from China. After a remand, the Court of International Trade and eventually the Federal Circuit affirmed. Sigma filed this appeal, which was stayed pending the Federal Circuit's decision. The panel lifted the stay after that decision issued and proceeded to address Sigma's appeal.

The panel held that it had jurisdiction, and the action did not need to be initiated in the Court of International Trade and then appealed, if at all, to the Federal Circuit. The panel held that 28 U.S.C. § 1582, which vests in the Court of International Trade exclusive jurisdiction over "any civil action which arises out of an import transaction and which is commenced by the United States . . . to recover customs duties," poses no jurisdictional obstacle to a relator's False Claims Act suit in federal district court to recover customs duties.

Affirming the district court's denial of Sigma's motion for judgment as a matter of law or a new trial, the panel held that 19 U.S.C. § 1592, which provides a specific mechanism for the United States to recover fraudulently avoided customs duties, does not displace the False Claims Act as to claims like Island's. Rather, § 1592 overlaps with the False Claims Act, which reaches antidumping duties that an importer has fraudulently evaded paying.

The panel rejected Sigma's argument that it lacked an "obligation to pay" antidumping duties, as defined by the False Claims Act.

The panel concluded that Island's theory that Sigma violated the False Claims Act by knowingly falsely declaring that no antidumping duties were owed on its products was both legally valid and supported by sufficient evidence. Sigma argued that it lacked the required scienter because, at the time of its imports, it would have been objectively reasonable to believe that its products were not covered by the China Order. The panel held that such an objective-reasonableness defense was foreclosed by *United States ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739 (2023).

The panel further held that the evidence at trial was plainly sufficient to support the jury's verdict in Island's favor under either of Island's theories of liability.

## COUNSEL

Nicole A. Saharsky (argued) and Kelly B. Kramer, Mayer Brown LLP, Washington, D.C.; C. Mitchell Hendy and Matthew H. Marmolejo, Mayer Brown LLP, Los Angeles, California; for Plaintiff-Appellee.

Joseph H. Lang Jr. (argued), Carlton Fields PA, Tampa, Florida; Michael L. Yaeger, Carlton Fields PA, New York, New York; for Defendant-Appellant.

Sarah W. Carroll (argued), Anna O. Mohan, Charles W. Scarborough, and Michael S. Raab, Attorneys, Appellate Staff; Brian M. Boynton, Principal Deputy Assistant Attorney General; Washington, D.C.; for Amicus Curiae United States of America.

Douglas W. Baruch, Jennifer M. Wollenberg, and James D. Nelson, Morgan Lewis & Bockius LLP, Washington, D.C.; Tara S. Morrissey and Andrew R. Varcoe, United States Chamber Litigation Center, Washington, D.C.; Erica Klenicki, NAM Legal Center, Washington, D.C.; for Amici Curiae National Association of Manufacturers and Chamber of Commerce of the United States of America.

Jonathan K. Tycko and Jaclyn S. Tayabji, Tycko & Zavareei LLP, Washington, D.C.; Jacklyn DeMar, The Anti-Fraud Coalition, Washington, D.C.; for Amicus Curiae the Anti-Fraud Coalition.

---

## ORDER

The opinion filed on June 23, 2025, is amended and the amended opinion is filed concurrently with this order. With this amendment, the panel unanimously votes to deny the petition for panel rehearing and petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 40.

The petitions for rehearing and rehearing en banc are **DENIED**. No further petitions may be filed.

# OPINION

FRIEDLAND, Circuit Judge:

The False Claims Act imposes liability for certain acts of fraud against the federal government. The jury in this case found Sigma Corporation liable under the False Claims Act for knowingly making false statements on customs forms to avoid paying tariffs on some of its imports from China. Sigma appeals, arguing that it is entitled to judgment as a matter of law or, in the alternative, a new trial. We disagree and therefore affirm the judgment.

## I.

## A.

The United States tries to protect domestic businesses by preventing companies from importing foreign goods at prices below the market prices in the exporting country. In the parlance of international trade, flooding another country's market with such underpriced goods is called "dumping."

To prevent dumping, Congress has authorized the Department of Commerce ("Commerce") to impose "antidumping duties" on products exported to the United States at less than their fair value. 19 U.S.C. § 1673. Commerce issues antidumping duty orders that both identify covered products and set the rates for calculating applicable duties. *See id.*; 19 C.F.R. § 351.211. Those rates generally reflect the difference between a given product's market price in the exporting country and its import price. 19 U.S.C. §§ 1673, 1677a, 1677b.

The importer is responsible for filing an "entry" with Customs and Border Protection ("Customs") that declares the "value, classification and rate of duty applicable to the merchandise" being imported. *Id.* § 1484(a)(1)(B). The entry must also include "such other information as is necessary" for Customs to properly assess duties. *Id.* "Duties and the liability for their payment accrue upon imported merchandise on arrival" in the United States. 19 C.F.R. § 141.1(a). The importer usually must deposit estimated duties at the time of entry. 19 U.S.C. § 1505(a).

Importers initially pay only *estimated* antidumping duties because "the United States uses a 'retrospective' assessment system under which final liability for antidumping . . . duties is determined after merchandise is imported." 19 C.F.R. § 351.212(a). The antidumping duty rate is reviewed and re-determined at least annually to account for changing prices in both the exporting country and the United States. 19 U.S.C. § 1675(a). An importer may therefore ultimately owe more or less than the estimated antidumping duties it initially deposited.

The final computation and ascertainment of antidumping duties for an entry is called "liquidation." 19 C.F.R. § 159.1. Entries that are not liquidated within one year will generally be "deemed liquidated" by operation of law at the estimated duty rate deposited upon arrival. 19 U.S.C. § 1504(a). But liquidation of an entry can be "suspended" by statute or court order, preventing liquidation until the suspension is lifted. *Id*. Although completed liquidations are generally "final and conclusive," *id.* § 1514(a), if Customs later learns that an importer has avoided duties by means of a false statement or omission, it "shall require" that those duties be paid and may pursue penalties through litigation before the United States Court of International Trade ("CIT"), *id.* § 1592.

## B.

Questions sometimes "arise as to whether a particular product is included within the scope of an antidumping . . . duty order." 19 C.F.R. § 351.225(a) (2018). An importer, Customs, or another interested party can seek clarification from Commerce through a process called a scope inquiry. *Id.* § 351.225(b), (c).[1]

When Commerce conducts a scope inquiry, it may decide that the antidumping duty order covers the product based on the order's plain language alone. *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017). Or it may need to take the additional step of considering the factors found at 19 C.F.R. § 351.225(k)(1) (2018). These (k)(1) factors include any prior scope determinations by Commerce and any determinations by the International Trade Commission as to the continued necessity of a given antidumping duty order. *Id.*; 19 C.F.R. § 351.218(a); 19 U.S.C. § 1677(2).[2] If both the plain language of the

---

[1] The scope-inquiry regulations were updated in 2021, 2023, and 2024. *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52300, 52374 (Sept. 20, 2021); *Administrative Protective Order, Service, and Other Procedures in Antidumping and Countervailing Duty Proceedings*, 88 Fed. Reg. 67069, 67077 (Sept. 29, 2023); *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20766, 20833 (Mar. 25, 2024). We refer in this opinion to the 2018 version of 19 C.F.R. § 351.225 because that was the version in effect throughout the period relevant to this case.

[2] The International Trade Commission is not part of Commerce; it is an "independent, nonpartisan, quasi-judicial federal agency that fulfills a range of trade-related mandates." U.S. Int'l Trade Comm'n, *About the*

antidumping duty order and the (k)(1) factors are inconclusive, Commerce then considers the factors in the next subsection, (k)(2). 19 C.F.R. § 351.225(k)(2) (2018). The (k)(2) factors include the product's physical characteristics, its ultimate use, and the way it is marketed. *Id.* Commerce's scope rulings are reviewable in the CIT, 28 U.S.C. § 1581, and the CIT's decisions are in turn appealable to the United States Court of Appeals for the Federal Circuit, *id*. § 1295(a)(5).

## C.

In 1992, Commerce issued an antidumping duty order covering certain "carbon steel butt-weld pipe fittings" imported from China (the "China Order"). *Antidumping Duty Order and Amendment; Certain Carbon Steel Butt-Weld Pipe Fittings from China*, 57 Fed. Reg. 29702, 29703 (July 6, 1992). The China Order identifies the butt-weld pipe fittings covered as those "used to join sections in piping systems where conditions require permanent, welded connections, as distinguished from fittings based on other fastening methods (*e.g.*, threaded, grooved, or bolted fittings)." *Id.* These fittings have beveled ends to facilitate welding onto pipes during installation and come in various shapes. *Carbon Steel Butt-Weld Pipe Fittings from Brazil, China, Japan, Taiwan, and Thailand, Inv. No. 731-TA-308-310, 520-521*, USITC Pub. No. 4628, at I-4, I-5 fig. I-1 (Aug. 1, 2016) (Fourth Review) ("ITC Report") (showing representative products).

---

*USITC*, https://perma.cc/NDS3-RB7W. By statute, it is responsible for conducting periodic reviews of "whether revocation of . . . [an] antidumping duty order" would lead to "continuation or recurrence of dumping . . . and of material injury" to domestic businesses. 19 U.S.C. § 1675(c)(1).

The China Order is part of a family of antidumping duty orders issued between 1986 and 1992 covering the same type of products from Brazil, Japan, Taiwan (the "Taiwan Order"), and Thailand.[3]   Although their exact wording varies, all five orders cover "carbon steel butt-weld pipe fittings," and the "definition of the subject merchandise [is] essentially the same for all five countries."  ITC Report at 6 n.26.

In 1992, Commerce clarified the scope of one of the butt-weld pipe fitting orders in response to an inquiry from Sprink, Inc., an importer of Taiwanese pipe fittings (the "Sprink Ruling").  Sprink asked Commerce to rule that its "Sprink-let" welded outlet, which is a pipe fitting that connects fire sprinklers to pipes, was not a "butt-weld pipe fitting" within the meaning of the Taiwan Order.  Sprink argued, among other things, that the product was not covered because not all of its connections would be welded upon installation.  Commerce rejected that argument, explaining that "the order does not require that *all* . . . connections be welded" and that a "pipe fitting with beveled edges that is permanently joined through welding falls within the scope of the order."  Commerce held that this conclusion was clear from the Taiwan Order "itself" and the "documents supporting" it.

---

[3] *Antidumping Duty Order; Certain Carbon Steel Butt-Weld Pipe Fittings from Brazil*, 51 Fed. Reg. 45152 (Dec. 17, 1986); *Antidumping Duty Order; Certain Carbon Steel Butt-Weld Pipe Fittings from Taiwan*, 51 Fed. Reg. 45152 (Dec. 17, 1986); *Antidumping Duty Order; Certain Carbon Steel Butt-Weld Pipe Fittings from Japan*, 52 Fed. Reg. 4167 (Feb. 10, 1987); *Antidumping Duty Order; Certain Carbon Steel Butt-Weld Pipe Fittings from Thailand*, 57 Fed. Reg. 29702 (July 6, 1992).

**D.**

Defendant-Appellant Sigma Corporation ("Sigma") imported welded outlets from China between 2010 and 2018. Sigma's outlets are nearly identical to those addressed by the Sprink Ruling. One end of each outlet has a beveled edge designed to be welded to a pipe during installation. The other end has a threaded connection for a sprinkler head or other attachment. The present case concerns whether Sigma is liable under the False Claims Act ("FCA") for knowingly making false statements on customs forms to avoid paying antidumping duties on those welded outlets.

The FCA prohibits certain acts of fraud against the federal government and imposes treble damages and penalties. 31 U.S.C. § 3729. The FCA allows private parties, called "relators," to sue on behalf of the United States to recover money owed. *Id.* § 3730(b); *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 932 (2009). Such suits are sometimes known as "qui tam" actions. *Eisenstein*, 556 U.S. at 932. The FCA incentivizes private parties to identify and pursue fraud by awarding them up to thirty percent of the damages if their suit is successful. 31 U.S.C. § 3730(d).

One of Sigma's competitors, Island Industries, sued Sigma and five other importers under the FCA.[4] Island sued as a relator under the FCA provision that makes liable anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" or

---

[4] Three of those other importers eventually settled, and proceedings against the remaining two others—including Vandewater International, Inc.—were stayed when those importers filed for bankruptcy. As a result, Sigma is the only defendant involved in the present appeal.

"knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Id.* § 3729(a)(1)(G). The FCA defines "knowingly" to mean that a person (i) has "actual knowledge" of the falsity of information in the statement; (ii) "acts in deliberate ignorance of the truth or falsity of" such information; or (iii) "acts in reckless disregard of the truth or falsity of" such information. *Id.* § 3729(b)(1)(A). It "require[s] no proof of specific intent to defraud." *Id.* § 3729(b)(1)(B).

Island alleged that Sigma violated the FCA by making two types of false statements on customs forms to evade the antidumping duties that apply to welded outlets. Island alleged that Sigma (1) declared that the products it was importing were not subject to antidumping duties and (2) described the products as steel couplings even though it marketed them to customers as welded outlets.

According to Sigma, it only became aware of the Sprink Ruling around the time the FCA suit was filed. Recognizing that its welded outlets were essentially identical to Sprink's, Sigma took the position that the Sprink Ruling was incorrect. Sigma requested a scope ruling from Commerce, as did two of its codefendants in the FCA suit, urging Commerce to take a fresh look at the scope of this family of antidumping orders. Sigma contended that its outlets were not covered because the only beveled end was curved and would be welded onto another pipe that would not itself be beveled.

Commerce undertook a (k)(1) analysis—which, as explained above, includes evaluating relevant prior scope determinations—and ruled that Sigma's and the other companies' welded outlets fell within the scope of the China Order. Commerce stated that it was "not bound" by the

Sprink Ruling because the text of the Taiwan Order differs somewhat from that of the China Order, but it nevertheless concluded that "here, as in [the Sprink] case, . . . the merchandise is covered by the scope of an antidumping order on 'butt-weld pipe fittings' because the merchandise has a beveled end that is permanently joined by welding." Sigma and the two codefendants challenged Commerce's ruling before the CIT. *See Vandewater Int'l, Inc. v. United States*, No. 18-00199 (Ct. Int'l Trade); *Sigma Corp. v. United States*, No. 19-00003 (Ct. Int'l Trade).[5]

The CIT was puzzled that Commerce had said the Sprink Ruling was not binding given that the Sprink Ruling addressed "virtually identical" products and given that the Taiwan Order it interpreted is a "companion" to the China Order. *Vandewater Int'l, Inc. v. United States*, 476 F. Supp. 3d 1357, 1360 (Ct. Int'l Trade 2020). The CIT observed that "[f]or over 25 years, . . . Commerce has treated [such] outlets as butt-weld fittings" covered by this family of orders, which "would seem to be dispositive." *Id.* at 1361. But because the CIT was reviewing the reasons that Commerce gave for its decision, and because it was unsatisfied with the other sources on which Commerce had based its decision, the CIT remanded for Commerce to conduct a more thorough analysis that also included the (k)(2) factors. *Id.* at 1362.

On remand, Commerce again held that the welded outlets were "butt-weld pipe fittings" within the meaning of

---

[5] *Vandewater* concerned products that were imported by one of the codefendants, which the parties treated throughout these proceedings as materially identical to Sigma's products at issue here, and which we also therefore assume are identical for purposes of our analysis. Sigma intervened in *Vandewater*, which was the lead case before the CIT.

the China Order.  Commerce clarified that it had said the Sprink Ruling was not binding because that ruling involved an order with "slightly different language" than the China Order, but that it nevertheless viewed the Sprink Ruling as "informative" because it concerned essentially identical products.  Commerce rejected the argument that products with a curved edge cannot be covered butt-weld pipe fittings. It also reiterated the reasoning of the Sprink Ruling that a product can be a covered butt-weld pipe fitting even if "not all ends . . . have a beveled edge to facilitate a permanent connection."

The CIT affirmed that scope ruling on appeal. *Vandewater Int'l Inc. v. United States*, 589 F. Supp. 3d 1324, 1328 n.1, 1343 (Ct. Int'l Trade 2022).  Sigma appealed that decision to the Federal Circuit.  *See Vandewater Int'l Inc. v. United States*, No. 23-1093 (Fed. Cir. Dec. 14, 2022), ECF No. 10 (consolidating appeals).  The Federal Circuit likewise affirmed.  *Vandewater Int'l Inc. v. United States*, 130 F.4th 981, 995 (Fed. Cir. 2025).

While the scope ruling litigation played out, Island continued to pursue its FCA lawsuit.  The United States did not intervene in the FCA suit.  At a jury trial, Island presented evidence and arguments supporting both of its theories of fraud: first, that Sigma falsely declared that no antidumping duties were owed, and second, that Sigma misidentified its products as steel couplings instead of welded outlets.  Island presented scienter evidence that Sigma would have been on notice of the likelihood that its imports were subject to antidumping duties, that it did not take basic steps to figure out whether they were, and that it would have been easy to find the China Order and the Sprink Ruling.  Island also presented scienter evidence that although Sigma called its products "welded outlets" on its

website and in its product catalog, it referred to them as "steel couplings" on its customs forms (which did not trigger an antidumping duty). Because of Commerce's scope ruling, the district court instructed the jury that Sigma's statements that it owed no antidumping duties were false.

The jury returned a general verdict for Island, finding that Sigma was liable for violating the FCA and that it owed over $8 million (before trebling). Sigma filed a post-trial motion for judgment as a matter of law, or in the alternative for a new trial, which the district court denied. Sigma then appealed. We stayed this appeal pending the Federal Circuit's decision in *Vandewater International Inc. v. United States*. That decision has now issued, and the Federal Circuit has denied Sigma's petition for panel rehearing and rehearing en banc, *Vandewater Int'l Inc. v. United States*, No. 23-1093 (Fed. Cir. May 23, 2025), ECF No. 87, so we lift our stay and proceed to address this appeal.

## II.

We review de novo jurisdictional questions and rulings on motions for judgment as a matter of law. *See United States ex rel. Alexander Volkhoff, LLC v. Janssen Pharmaceutica N.V.*, 945 F.3d 1237, 1241 (9th Cir. 2020); *EEOC v. GoDaddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). We review a denial of a motion for a new trial for abuse of discretion. *Jorgensen v. Cassiday*, 320 F.3d 906, 918 (9th Cir. 2003). We decide legal questions de novo, and "a district court abuses its discretion when it makes an error of law." *United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc).

## III.

We must first decide whether we have jurisdiction over this action, or whether it needed to be initiated in the CIT and then appealed (if at all) to the Federal Circuit. *See* 28 U.S.C. §§ 1582(3), 1295(a)(5).

Congress vested in the CIT exclusive jurisdiction over "any civil action which arises out of an import transaction and which is commenced by the United States . . . to recover customs duties." *Id.* § 1582(3). Over two decades ago, we held that an FCA suit filed by the United States against a defendant alleged to have evaded paying customs duties must be brought in the CIT under that jurisdictional provision. *United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d 829, 836-37 (9th Cir. 2004).[6] We specifically declined to rule on whether a relator can bring an "FCA action involving customs duties in the district courts." *Id.* at 837 n.14.

We now hold that § 1582 poses no jurisdictional obstacle to a relator's FCA action in federal district court to recover customs duties. "A civil action is commenced by filing a complaint with the court." Fed. R. Civ. P. 3. A "civil action . . . commenced by the United States . . . to recover customs duties" that must be brought in the CIT, 28 U.S.C.

---

[6] Upon transfer of the case to the CIT following our decision, the CIT disagreed and held that it did not in fact have jurisdiction because the FCA provides for damages and civil penalties, not the recovery of customs duties. *United States v. Universal Fruits & Vegetables Corp.*, 433 F. Supp. 2d 1351, 1355-56 (Ct. Int'l Trade 2006). No matter how persuasive the CIT's reasoning, we have no authority here to overrule an earlier decision of our court. *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc).

§ 1582(3), is therefore a lawsuit in which "the United States" filed the complaint.

The Supreme Court has concluded that the term "the United States" in another jurisdictional statute does not include FCA relators. *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009). In *Eisenstein*, the Supreme Court interpreted the statute governing appeal deadlines, which provides more time to appeal in civil actions in which one of the parties is "the United States." 28 U.S.C. § 2107(b). The Supreme Court held that "[t]he United States . . . is a party to a privately filed FCA action only if it intervenes." *Eisenstein*, 556 U.S. at 933 (quotation marks omitted). This holding necessarily means that a relator is not "the United States" for purposes of interpreting the appeal deadline statute. Similarly, a relator is not "the United States" for purposes of interpreting § 1582's grant of exclusive jurisdiction to the CIT.

To be sure, in the standing context we have said that relators "effectively stand[] in the shoes" of the United States when they pursue FCA suits. *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 748 (9th Cir. 1993). But that metaphor does not mean that a statute's reference to "the United States" can be read to include FCA relators. In *Kelly*, we held that relators have Article III standing to bring FCA suits because the government would have standing and because "the FCA effectively assigns the government's claims" to relators. *Id.* That assignment theory of standing itself suggests that the term "the United States" does not include relators because assignment necessarily involves two distinct parties: an assignor and an assignee. *See* Assignable, Black's Law Dictionary (12th ed. 2021) (defining "assignable" as "transferable from one person to

another, so that the transferee has the same rights as the transferor had").

We accordingly have jurisdiction over this appeal.

## IV.

We now consider Sigma's contentions that it is entitled either to judgment as a matter of law or to a new trial. We reject Sigma's arguments.

## A.

Sigma contends that 19 U.S.C. § 1592, which provides a specific mechanism for the United States to recover fraudulently avoided customs duties, displaces the FCA as to claims like Island's. We disagree and hold that the FCA reaches antidumping duties that an importer has fraudulently evaded paying.[7]

The FCA was intended to "reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). Since it was amended in 1986, the FCA has covered evasion of obligations to pay the government in addition to fraudulent requests for payment from the government. False Claims Amendments Act of 1986, Pub. L. No. 99-562, 100 Stat. 3153, 3153 (codified as amended at

---

[7] We ordered supplemental briefing on this issue after oral argument. Island argues in its supplemental brief that Sigma forfeited the argument that § 1592 displaces the FCA by failing to raise it before the district court or in its opening brief on appeal. We resolve the issue notwithstanding Sigma's possible forfeiture because it is purely legal and "does not depend on the factual record developed below." *Organic Cannabis Found., LLC v. Commissioner*, 962 F.3d 1082, 1092 n.6 (9th Cir. 2020) (quoting *Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004)).

31 U.S.C. § 3729(a)(1)(G)).    Although Congress has explicitly excluded claims under the Internal Revenue Code from the FCA's otherwise sweeping scope, 31 U.S.C. § 3729(d), there is no carveout for customs duties.

Separately, § 1592 prohibits the importation of merchandise by means of a material false statement or omission.    19 U.S.C. § 1592(a)(1)(A).    Section 1592 provides maximum penalty amounts, procedures for the United States to seek such penalties in the CIT, and partial protection from penalties for importers who voluntarily disclose violations.    *Id.* § 1592(c), (e).    Section 1592 provides that Customs "shall require" any avoided duties to be paid even if the entry has been liquidated.  *Id.* § 1592(d). In other words, when duties are avoided by fraud or negligence, § 1592 provides an exception to the general rule that liquidation is "final and conclusive."  *Id.* § 1514(a). Only the government may initiate an action under § 1592, but a whistleblower may be awarded up to a quarter of any recovery that the government obtains, not to exceed $250,000 for any case.  *Id.* § 1619.

Section 1592 undoubtedly overlaps with the FCA.  But under the canon against implied repeal, "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."  *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1156 (9th Cir. 2020) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). One statute should be read to impliedly repeal another only if there is an irreconcilable conflict between the two.  *Id.*

There is no irreconcilable conflict here.  Section 1592 does not state that it is an exclusive remedy.  And the FCA expressly contemplates that FCA cases can proceed in

parallel with the government's pursuit of "any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty." 31 U.S.C. § 3730(c)(5). The FCA also has many mechanisms that prevent a relator from undermining the interests of the United States. It provides that a relator may not "bring an action . . . based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." *Id.* § 3730(e)(3). Even when a relator can bring suit, the government has the right to assume primary responsibility for the FCA case, to dismiss or settle it, or to request that the court limit the relator's participation in various ways. *Id.* § 3730(c). Alternatively, the government can decline to get involved and allow the relator's action to proceed, as it did with respect to Island's FCA suit. *Id.* § 3730(b)(4), (c)(3).

The statutory and legislative history of the FCA and § 1592 confirms that Congress specifically intended the two statutes to coexist. Section 1592 has been in substantially its current form since 1978. Customs Procedural Reform and Simplification Act of 1978, Pub. L. No. 95-410, § 110(a), 92 Stat. 888, 893. In 1986, Congress amended the FCA to reach fraud to avoid payment obligations to the government. False Claims Amendments Act of 1986, Pub. L. No. 99-562, 100 Stat. 3153, 3153. In 2009, Congress further amended the FCA, changing the definition of an "obligation" to make clear that, contrary to what one court of appeals had held, the FCA reaches customs duties even though the precise amount due may not be fixed at the time of entry. *See* S. Rep. No. 111-10, at 14 n.10 (2009). The fact that Congress enacted that amendment to the FCA when § 1592 already provided a pathway for recovering fraudulently avoided

customs duties demonstrates that Congress did not intend § 1592 to be the sole avenue for recovering such duties.

Sigma separately argues that § 1592 is the exclusive pathway for recovering antidumping duties under the reasoning of *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1 (1981). In *Sea Clammers*, the Supreme Court held that "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under [42 U.S.C.] § 1983." *Id.* at 20. The Supreme Court has explained that this doctrine applies when a specific statute creates a remedial framework against the backdrop of a general statute that "creates no rights but merely provides a civil cause of action to remedy some otherwise defined federal right," and that the doctrine does not contravene the canon against implied repeal. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 n.2 (2005) (quotation marks omitted) (quoting *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979)). The Supreme Court has only ever said that the *Sea Clammers* doctrine applies to § 1983 and to 42 U.S.C. § 1985(3), both of which the Supreme Court has recognized are purely remedial general statutes. *Id.* (citing *Great Am. Fed. Sav. & Loan Ass'n*, 442 U.S. at 376).

Even assuming that the *Sea Clammers* doctrine is not limited to §§ 1983 and 1985(3) and that there are other purely remedial general statutes to which it might apply, the FCA is not a purely remedial general statute. The FCA does not merely provide a cause of action for violations of rights defined elsewhere—it prohibits certain types of fraud against the government. To be sure, the type of FCA liability at issue here requires an "obligation" to the government

created by another statute or regulation. But the FCA affirmatively prohibits fraudulent conduct that avoids satisfying such an obligation. A person violates the relevant provision of the FCA if she "knowingly makes, uses, or causes to be made or used, a false record or statement material to [that] obligation." 31 U.S.C. § 3729(a)(1)(G). *Sea Clammers* and other precedents concerning purely remedial general statutes like § 1983 are therefore not applicable here.[8]

## B.

Sigma contends that even if § 1592 does not displace the FCA as to customs duties, Sigma still cannot be liable because it had no "obligation" to pay antidumping duties, as defined by the FCA. We disagree.

An "obligation to pay" is indeed an essential element of an FCA action for fraudulently avoiding paying money to the government. *See* 31 U.S.C. § 3729(a)(1)(G). A plaintiff bringing such a claim must show that the United States "was owed a specific, legal obligation at the time that the alleged false record or statement was made." *United States v. Bourseau*, 531 F.3d 1159, 1169 (9th Cir. 2008). Under the FCA, an "obligation" means "an established duty [to pay], whether or not fixed," arising from a statute or regulation (among other sources). 31 U.S.C. § 3729(b)(3).

---

[8] The *Sea Clammers* doctrine may be inapplicable for the independent reason that the enactment of the modern version of § 1592 pre-dates the creation of the type of FCA claim at issue here, as discussed above. An FCA claim to recover customs duties does not attempt to assert "rights created by a *later* statute . . . within the remedial framework of [an] *earlier* one." *Rancho Palos Verdes*, 544 U.S. at 120 n.2 (emphasis modified) (quotation marks omitted) (quoting *Great Am. Fed. Sav. & Loan Ass'n*, 442 U.S. at 377).

"An importer becomes liable for any antidumping duty as soon as the foreign merchandise arrives in the United States." *Thyssenkrupp Steel N. Am., Inc. v. United States*, 886 F.3d 1215, 1218 (Fed. Cir. 2018) (citing 19 C.F.R. § 141.1(a)). Sigma's welded outlets are subject to antidumping duties under the China Order. *Vandewater Int'l Inc. v. United States*, 130 F.4th 981, 995 (Fed. Cir. 2025).[9] Sigma therefore became liable for antidumping duties when it imported its welded outlets from China between 2010 and 2018. That liability was an "obligation" under the FCA at the time of the welded outlets' arrival even though the amount due was not yet fixed through liquidation. *See* 31 U.S.C. § 3729(b)(3). Of course, an importer that wrongly believes that no duties are owed might not be liable under the FCA. But any lack of liability in such a case would turn on a lack of scienter, not on the lack of an obligation.

Sigma contends that it never had an obligation to pay duties in light of a portion of the scope ruling concerning the final assessment of duties for affected products. Specifically, Sigma points to the fact that Commerce plans to collect additional duties only for entries from recent years, not for older ones like Sigma's. But Commerce's decision about the years of entries on which duties can be collected turns on its interpretation of the complicated restrictions in the liquidation and suspension regulations. *See* 19 C.F.R.

---

[9] Sigma argued for the first time in its petition for rehearing that Commerce might reach a different result in Sigma's (k)(2) proceedings than was reached in *Vandewater*. Because Sigma previously represented that the results of the *Vandewater* proceedings would apply to Sigma as well, we deem its new argument to have been waived. *See Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 n.1 (2017) ("[W]aiver is the 'intentional relinquishment or abandonment of a known right.'" (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993))).

§ 351.225(l) (2018). Neither the regulations nor Commerce's implementation of them suggests that duties were never owed on entries that can no longer be reached through the liquidation process. Indeed, under § 1592, even if further duties cannot be collected through the liquidation process, the duties can still be recovered if there was fraud or negligence. Section 1592 therefore shows that the existence of an obligation to pay is independent of the details of the liquidation process.

Sigma further argues that it cannot be liable under the FCA because the government sustained no damages as shown by the fact that Commerce does not plan to collect additional duties on older entries. That contention merely repackages Sigma's other arguments, and we reject it. Damages in an FCA suit can be measured by "the difference between what the defendant should have paid the government and what the defendant actually paid the government." *Bourseau*, 531 F.3d at 1172. As we have explained, Sigma should have paid antidumping duties when it imported its welded outlets. Sigma did not do so, depriving the government of money.

In sum, an importer cannot evade duties, wait until its entries are liquidated, and then assert based on that liquidation that its actions did not deprive the government of money.

## C.

Sigma finally argues that it is entitled to judgment as a matter of law, or at least a new trial, because of purported flaws in the two theories of liability that Island put to the jury. Island's first theory at trial was that Sigma violated the FCA by knowingly falsely declaring that no antidumping duties were owed on its products. Island's second theory at

trial was that Sigma violated the FCA by knowingly misrepresenting its products as steel couplings. Sigma contends that it is entitled to judgment as a matter of law on the first theory under an objective-reasonableness defense to scienter because a reasonable person could have believed that no duties were owed. Once Island's first theory is out of the picture, Sigma argues, it is entitled to judgment in its favor because there is insufficient evidence supporting the second theory. In the alternative, Sigma asserts that it is entitled to a new trial because the jury might have improperly based its general verdict on the first theory. We reject Sigma's arguments.

Sigma contends that it lacked the scienter required by the first theory because, at the time of its imports, it would have been objectively reasonable to believe that its products were not covered by the China Order. Scienter under the FCA encompasses actual knowledge, deliberate ignorance, and reckless disregard. 31 U.S.C. § 3729(b)(1)(A). Under the objective-reasonableness defense that Sigma seeks to invoke, an FCA defendant would always prevail if a hypothetical reasonable person could have believed the defendant's statements were true, regardless of any evidence that the real-life defendant had actual knowledge of, was deliberately ignorant of, or recklessly disregarded the falsity of its statements.

Such a defense is foreclosed by the Supreme Court's decision in *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023). The Supreme Court in *SuperValu* concluded that "[t]he FCA's scienter element refers to [a defendant's] knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *Id.* at 749. Under *SuperValu*, a defendant cannot (as Sigma seeks to do here) escape liability by arguing that

an objectively reasonable person could have believed that the statements it submitted to the government were true. That is so even if the terms of the defendant's legal obligation were ambiguous. The Supreme Court explained that "ambiguity does not preclude" an FCA defendant "from having learned [the] correct meaning" of its obligation. *Id.* at 753. An "honest mistake" may preclude liability, but it must be the *defendant's* honest mistake, not a hypothetical honest mistake made by someone else. *Id.* Even if the China Order were ambiguous enough that some hypothetical reasonable person could have believed that it did not cover Sigma's welded outlets, under *SuperValu* that would not make Sigma entitled to judgment in its favor on Island's first theory of liability.[10]

We therefore reject Sigma's challenge to the legal validity of Island's first theory of liability. And Sigma does not challenge the legal validity of the second theory. Where a general verdict encompasses multiple legally valid

---

[10] Sigma contends that a footnote in *SuperValu* left open the possibility that the FCA's scienter definition "still incorporates an objective element." That footnote states: "In some civil contexts, a defendant may be called 'reckless' for acting in the face of an unjustifiably high risk of illegality that was so obvious that it should have been known, even if the defendant was not actually conscious of that risk. We need not consider how (or whether) that objective form of 'recklessness' relates to the FCA." *SuperValu*, 598 U.S. at 751 n.5 (citation omitted).

Sigma does not explain how this footnote helps it or what it thinks went wrong at trial concerning this issue. Sigma has not argued that the jury instructions captured too many forms of mens rea or that it was precluded from introducing evidence rebutting a theory of objective recklessness. For that reason, any argument based on the *SuperValu* footnote is forfeited. *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed [forfeited].").

theories, "we will uphold the verdict if the evidence is sufficient with respect to any of the [theories]." *McCord v. Maguire*, 873 F.2d 1271, 1273-74 (9th Cir.), *amended by* 885 F.2d 650 (9th Cir. 1989). Sigma does not challenge the sufficiency of the evidence supporting the first theory, so the verdict can be sustained without further analysis of the evidence.

In any event, the evidence at trial was plainly sufficient to support the jury's verdict in Island's favor under either theory. On the first theory, the jury heard evidence that Sigma declared on customs forms that no antidumping duties were owed on its welded outlets, and the jury was correctly instructed that this was a false statement. The jury also heard expert testimony that such statements are material because they tend to dissuade Customs from assessing antidumping duties. *See* 31 U.S.C. § 3729(b)(4) ("[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.").

As for scienter, there was sufficient evidence for the jury to conclude that Sigma acted with either deliberate ignorance or reckless disregard for the truth when it declared on customs forms that it did not owe antidumping duties on its welded outlets. *See Bourseau*, 531 F.3d at 1168 (holding that FCA scienter encompasses "the 'ostrich' type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted" (quotation marks omitted)). The jury heard evidence that products from China, and steel products in particular, are frequently subject to antidumping duty orders. Yet Sigma made no inquiry into whether it owed duties on its welded outlets before stating that it did not. Sigma's vice president overseeing import operations

testified that Sigma had never seen the China Order or the Sprink Ruling—both of which were issued in 1992—until 2017 or 2018. That same executive testified that he did not recall anyone at Sigma looking at the International Trade Commission's periodic antidumping reviews or inquiring with Commerce or Customs as to whether its imports were subject to antidumping duties.

Other testimony made clear how easy it would have been for Sigma to learn about the China Order and the Sprink Ruling. Island's sales manager testified that he began looking into import regulations because Island's prices kept being undercut by products from China. Lacking any specialized experience in trade law or antidumping duty orders, he used Google and contacted an analyst at Commerce. Within 24 hours, he found the China Order and the Sprink Ruling. He immediately determined that welded outlets like Sigma's were likely subject to antidumping duties.

On the second theory, the jury heard evidence that Sigma called its products welded outlets in its product catalog and on its website but referred to them as steel couplings on customs forms. The jury also heard evidence that Customs does not assess antidumping duties on steel couplings. From that evidence, a reasonable jury could conclude that Sigma knowingly misrepresented its products as steel couplings to avoid antidumping duties.

## V.

For the foregoing reasons, we affirm the judgment against Sigma for violating the FCA.